1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - - - -

Jessie Cantrell, as          :
Personal
Representative of the        :
Estate of Cory
Cantrell,                    :

       Plaintiff,            : Case No. 1:22-cv-00739
                          Judge Douglas R. Cole
       vs.                   :

Scioto County, Ohio,         :
et al.,
                       :
       Defendants.
                       :

- - - - -

DEPOSITION OF DANIEL VASQUEZ
VIA VIDEOCONFERENCE

- - - - -

Witness Located at the Residence of Daniel Vasquez
Oakley, California 94561
December 19, 2024, 3:07 p.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                    A P P E A R A N C E S

2

    ON BEHALF OF PLAINTIFF:
3
          Shapero & Green LLC
4          25101 Chagrin Boulevard, Ste. 220
          Beachwood, OH 44122-5656
5          By Brian J. Green, Esq. (via Zoom)

6

    ON BEHALF OF DEFENDANTS:
7
          Teetor Westfall, LLC
8          200 East Campus View Boulevard, Ste. 200
          Columbus, OH 43235
9          By Andrew N. Yosowitz, Esq. (via Zoom)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                    Thursday Afternoon Session

2                     December 19, 2024, 3:07 p.m.

3                     - - - - -

4                S T I P U L A T I O N S

5                     - - - - -

6        It is stipulated by counsel in attendance that

7    the deposition of Daniel Vasquez, a witness

8    herein, called by the Defendants for

9    cross-examination, may be taken at this time by

10   the notary pursuant to notice and subsequent

11   agreement of counsel that said deposition may be

12   reduced to writing in stenotypy by the notary,

13   whose notes may thereafter be transcribed out of

14   the presence of the witness; that proof of the

15   official character and qualification of the notary

16   is waived.

17                     - - - - -

18

19

20

21

22

23

24

4

1                        I N D E X

2     Examination By                                Page

3     Mr. Yosowitz - Cross                             5

4
      Defendants' Exhibits                          Page
5
      Exhibit 1 - Incident Reports                    25
6
      Exhibit 2 - Medical Records                     30
7

8

9

10

11

12

13

14

15

16

17

18    (PDF exhibits have been provided to counsel with the
      transcript.  No hard copies were in the possession
19    of the court reporter.)

20

21

22

23

24

5

1          THE REPORTER:  Before I swear in the

2     witness, would counsel please identify yourself

3     for the record, state who you represent, and

4     express your stipulation that this deposition may

5     take place with a remote administration of the

6     oath and remote reporting of the deposition.

7     Let's begin with the noticing attorney.

8          MR. YOSOWITZ:  Andrew Yosowitz for the

9     defendants, and we stipulate to the remote

10    deposition and remote administration of the oath.

11         MR. GREEN:  Brian Green for plaintiff.

12    We so, too, stipulate.

13               - - - - -

14              DANIEL VASQUEZ

15    being first duly sworn, testifies and says as

16    follows:

17              CROSS-EXAMINATION

18    BY MR. YOSOWITZ:

19    Q.        Good afternoon.  Your name is Daniel

20    Vasquez, correct?

21    A.        That's correct.

22    Q.        My name is Andrew Yosowitz.  We're here

23    today for your deposition.  This is my client's

24    pretrial opportunity to question you via Zoom

about an expert report that you prepared in this case. I would ask that you give the same sincere cooperation as if a judge and jury were listening.
Do you understand that?
A. Yes, I do.
Q. You're here today with -- well, you're here virtually with attorney Brian Green, correct?
A. Correct.
Q. Okay. Please understand that even though we're all in an informal setting, everything you say here is just as important as if we were at trial in a courtroom with the judge and jury listening. Therefore, it's in your very best interest to give the most complete, accurate and truthful answers you can to each and every one of my questions.
Do you understand that?
A. Yes, I do.
Q. Please understand that the court reporter will produce a transcript of everything I say, everything you say and everything Mr. Green says while we're on the record. For this reason, I need all of your answers to be out loud. The court reporter cannot transcribe nonverbal

7

1     responses.

2              Do you understand that?

3     A.        Yes, I do.

4     Q.        You're going to have an opportunity to

5     review your transcript and you may make changes to

6     that transcript.  If you do make any changes to

7     your testimony, however, I may ask the Court to

8     allow me to reopen the deposition and question you

9     about any changed testimony.  I may also argue to

10    a judge and jury that the changes to your

11    testimony raise questions about your credibility.

12             Do you understand that?

13    A.        Yes.

14    Q.        Is there any physical, mental or

15    emotional reason why you can't give your most

16    accurate testimony today?

17    A.        No, there is not.

18    Q.        Are you under the influence of any

19    substance that would impair your ability to tell

20    the truth?

21    A.        No.

22    Q.        I'm going to give each of your words

23    their most common meaning unless you tell me that

24    a word has a meaning that is special to you.

8

1              Do you understand that?

2    A.        Yes.

3    Q.        Okay.  Please be sure to allow me to

4    complete the entire question before you begin your

5    answer.  Otherwise, as you'll see, I'll repeat the

6    entire question from the beginning so that we can

7    produce a clean record.

8              Do you understand that?

9    A.        Yes, I do.

10   Q.        Okay.  Do you understand that the oath

11   you took requires you to tell the whole truth, to

12   give all the information each question requests in

13   a straightforward manner, and in so doing, to use

14   the most candid and accurate language you possibly

15   can?

16   A.        Yes, I understand that.

17   Q.        Do you have any questions for me before

18   I begin my questions?

19   A.        No.

20   Q.        Are there any materials that you've

21   reviewed for this case that are not listed in your

22   expert report dated December 7, 2023?

23   A.        I reviewed the Sweeney report and also

24   captain, what's his name, Captain Damon Roberts.

9

1   Q.        His deposition?

2   A.        Yes.

3   Q.        Anything else?

4   A.        No.

5   Q.        Are all the opinions that you intend to

6   offer in this case contained in your expert report

7   dated December 7, 2023?

8   A.        Yes.

9   Q.        Do you have any changes to make to your

10  report at this time?

11  A.        No.

12  Q.        And what did you do to prepare for

13  today's deposition?

14  A.        I reviewed -- re-reviewed some of the

15  reports that we just discussed.

16  Q.        And other than your -- other than the

17  attorneys that have hired you, did you speak with

18  anyone about today's deposition?

19  A.        No.

20  Q.        Okay.  In your report dated December 7,

21  2023, you do not opine that any of the Scioto

22  County Sheriff's Office policies and procedures

23  were inadequate or deficient, correct?

24  A.        Correct.

1    Q.      Okay.  Your opinion is that various

2    jail employees failed to follow the Scioto County

3    Sheriff's Office policies and procedures, correct?

4    A.      Yes.  One in particular.

5    Q.      Okay.  Based on your review of the

6    policies and procedures and the testimony in this

7    case, a prisoner entering the Scioto County Jail

8    goes through multiple searches before he or she is

9    admitted to general population, correct?

10    A.      Yes.

11    Q.      Okay.  In fact, the policy requires

12    that all inmates are searched for contraband and

13    weapons during the reception process, correct?

14    A.      Correct.

15    Q.      And you would agree that searching

16    inmates for contraband and weapons during the

17    reception process is reasonable and appropriate,

18    correct?

19    A.      Yes, it is.

20    Q.      After the initial search, it's your

21    understanding that inmates at the Scioto County

22    Jail who have or will have criminal charges are

23    put through the body scanner, correct?

24    A.      Correct.

11

1    Q.          And a body scanner is a tool for

2    contraband detection, correct?

3    A.          It is.

4    Q.          Body scanners use some form of

5    radiation, such as x-rays or millimeter wave rays

6    to create an image which can detect metallic and

7    non-metallic items underneath clothing and hidden

8    in body cavities, correct?

9    A.          That's my understanding, yes.

10   Q.          And to your knowledge, body scanners

11   are the most recent technology jails and prisons

12   have to detect contraband on or inside the human

13   body, correct?

14   A.          Correct.

15   Q.          Are you familiar with body scanners?

16   A.          Yes, I am to some degree.

17   Q.          Have you ever been trained on one?

18   A.          No.

19   Q.          Have you ever operated a body scanner?

20   A.          No.

21   Q.          What experience do you have with body

22   scanners?

23   A.          That they're intended to try to locate

24   secreted contraband inside a person's body.

12

1   Q.         You understand that even body scanners

2   have difficulty picking up some materials,

3   correct?

4   A.         Yes.  They're not totally

5   100 percent --

6   Q.         A body scanner is a tool for detection

7   of contraband and weapons, it's not perfect,

8   correct?

9   A.         That is correct.

10  Q.         And based on your understanding of body

11  scanners and their use in corrections, you

12  understand it's difficult for body scanners to

13  pick up pills and powders because powders lack

14  density, correct?

15  A.         My understanding, yes.

16  Q.         And it's more -- even more difficult to

17  pick up pills and powders if they are hidden

18  within a person's body cavity, correct?

19  A.         Correct.

20  Q.         Nevertheless, to assist with contraband

21  detection, it's reasonable and appropriate for the

22  Scioto County Jail to use the body scanner on

23  every inmate who enters the jail, correct?

24  A.         If that's their decision, yes.

13

1    Q.          Okay.  In fact, Perry Steele, in this

2    case, was body scanned on June 18th, 2022, before

3    he entered his cell with Cory Cantrell, correct?

4    A.          According to the reports, yes.

5    Q.          You don't have any evidence from your

6    review of the case that there was any discernible

7    contraband on Perry Steele's June 18, 2022, body

8    scan, correct?

9    A.          That's correct.  I do not have any

10   other information other than what I read in the

11   report.

12   Q.          And then after the body scan, inmates

13   at the Scioto County Jail are then strip searched,

14   correct?

15   A.          That's a decision of the county

16   staff -- county jail staff if they want to do a

17   strip search, but not all inmates are strip

18   searched.

19   Q.          Well, you -- you've read their policy

20   721, which states that all inmates are going to be

21   strip searched, correct?

22   A.          Yes, that's correct.  I'm sorry about

23   that.

24   Q.          And you're familiar with strip searches

14

1    from your time working in corrections, correct?

2    A.        Oh, yes.

3    Q.        Okay.  And so during a strip search,

4    the prisoner must remove all of their clothing

5    while he or she is observed by an officer of the

6    same sex, correct?

7    A.        Yes.

8    Q.        And this is another search for

9    contraband, correct?

10   A.        Yes.

11   Q.        And it's reasonable and appropriate to

12   search inmates during the booking process,

13   correct?

14   A.        Yes.

15   Q.        That was the wrong question.  I missed

16   a word.

17             It's reasonable and appropriate to

18   strip search inmates during the booking process,

19   correct?

20   A.        If that's a decision up to the jail

21   staff, yes.

22   Q.        When you were at the Santa Clara Jail,

23   you strip searched inmates before they entered

24   general population, correct?

15

1   A.          They were strip searched by my staff,

2   yes.

3   Q.          Sure.  I would imagine that the warden

4   would not do the strip search?

5   A.          That's correct.

6   Q.          So there's at least three searches

7   conducted on inmates entering the Scioto County

8   Jail, an initial pat-down search, a body scan and

9   a strip search, correct?

10  A.          Yes.

11  Q.          Okay.  And in your experience as a law

12  enforcement officer, arresting officers also

13  conduct a search of their prisoner at the time of

14  arrest, correct?

15  A.          That's correct.

16  Q.          And we call that -- for those of us who

17  do criminal law, we call that a search incident to

18  arrest, correct?

19  A.          Yes.

20  Q.          The Scioto County Sheriff's Office also

21  conducts weekly shakedowns of selected housing

22  areas to discover, remove and prevent contraband,

23  correct?

24  A.          Yes.

1    Q.          And you're familiar with the term

2    "shakedown," correct?

3    A.          Yes.

4    Q.          Okay.  A shakedown is essentially a

5    cell search to look for contraband, correct?

6    A.          Correct.

7    Q.          Sometimes that's also called tossing

8    cells.  Have you heard that term before?

9    A.          I have.

10   Q.          Okay.  What did you call it at the

11   Santa Clara Jail?

12   A.          It was just a search of the -- just a

13   search of the housing unit or cell occupied by an

14   inmate.

15   Q.          And in this case -- relevant to this

16   case, Officer Tackett conducted a shakedown of

17   holding cell five on June 18, 2022, at 11:05 a.m.,

18   correct?

19   A.          Yes.

20   Q.          And Officer Tackett took out all of the

21   old mats, mattresses and bed rolls and issued new

22   mats and bed rolls because inmates can hide

23   contraband in their mats and bed rolls, correct?

24   A.          Correct.

17

1    Q.          And you would agree with me that

2    conducting shakedowns is a reasonable and

3    appropriate method to assist in the detection of

4    contraband, correct?

5    A.          Yes.

6    Q.          You would agree with me that it's

7    important to prosecute inmates and staff members

8    who illegally convey contraband into the Scioto

9    County Jail, correct?

10   A.          Yes.

11   Q.          And based on your review of the records

12   in this case, it's true that the Scioto County --

13   that Scioto County does prosecute inmates and

14   staff members who illegally convey contraband into

15   the jail, correct?

16   A.          Yes.

17   Q.          You're aware -- strike that.

18              This case deals with events that

19   occurred in the year 2022, correct?

20   A.          Correct.

21   Q.          Okay.  And you're aware that the Scioto

22   County Jail was inspected in 2022 and found to be

23   in compliance with all essential jail standards in

24   Ohio and all of the contraband detection

18

1    standards, correct?

2    A.        I'm not aware of any -- any of that

3    information.

4    Q.        Okay.  Were you not provided the 2022

5    Bureau of Adult Detention inspection report?

6    A.        Not that I recall, no.

7    Q.        Okay.  And you would agree with me that

8    the Scioto County Jail has reasonable policies and

9    practices to prevent the introduction of

10   contraband into the jail, correct?

11   A.        Yes.

12   Q.        Okay.  Turning to Cory Cantrell, the

13   decedent in this case.  He was originally booked

14   into the Scioto County Jail on January 19, 2022,

15   correct?

16   A.        Yes.

17   Q.        And he was booked in for a probation

18   violation, correct?

19   A.        Correct.

20   Q.        And the underlying charge for which he

21   was on probation had nothing to do with drugs,

22   right?

23   A.        I don't recall what the reasons were,

24   but he was booked for probation violation.

19

1    Q.          Do you -- you're in California, right?

2    A.          Correct, northern California.

3    Q.          And your law enforcement career has

4    been in California, correct?

5    A.          Yes.

6    Q.          Okay.  Do they have, like, domestic

7    protection orders in California?

8    A.          You mean domestic violence protection?

9    Q.          Right.

10   A.          Yes, they do.

11   Q.          Okay.  And if I -- if I told you that

12   Mr. Cantrell's underlying charge was violation of

13   a protection order, does that refresh your memory

14   as to why --

15   A.          No.  It doesn't at this point, no.

16   Q.          Okay.  During the booking process,

17   Mr. Cantrell underwent a preliminary medical

18   screen, correct?

19   A.          Yes.

20   Q.          Okay.  And the preliminary medical

21   screen consists of both booking officer

22   observations and questions to be answered by the

23   inmate, correct?

24   A.          Yes.

1   Q.       And the purpose of the preliminary

2   medical screen is to see if there's any medical

3   problem that requires immediate attention,

4   correct?

5   A.       Correct.

6   Q.       Unless there's something obvious that

7   the corrections officer can see, the corrections

8   officer's relying on the inmate to provide him or

9   her with truthful medical information, correct?

10   A.       Yes.

11   Q.       Corrections officers do not and should

12   not have access to an inmate's medical records,

13   correct?

14   A.       Correct.

15   Q.       Only medical staff should have access

16   to the inmate's medical records, correct?

17   A.       Yes, that's correct.

18   Q.       And on January 19, 2022, Cory Cantrell

19   did not report any medical problem requiring

20   immediate attention, correct?

21   A.       That's correct.

22   Q.       You're not aware -- strike that.

23           Are you familiar with the National

24   Commission on Correctional Healthcare?

21

1    A.          To some degree, yes, I've reviewed it

2    many -- sometime before.

3    Q.          Okay.  And the National Commission on

4    Correctional Healthcare puts out sample policies

5    and best practices, correct?

6    A.          Correct.

7    Q.          Okay.  You're not aware of any Ohio

8    regulation or guideline from the National

9    Commission on Correctional Healthcare that

10   mandates jail booking officers to review every

11   single prior preliminary medical screen of an

12   inmate, correct?

13   A.          Correct.

14   Q.          On April 4th, 2022, Cory Cantrell was

15   sentenced to 10 months in the Scioto County Jail,

16   correct?

17   A.          Yes.

18   Q.          Okay.  So at that point, Cory Cantrell

19   was no longer a pretrial detainee, he was a

20   convicted prisoner serving a sentence, correct?

21   A.          Yes.

22   Q.          Okay.  The Court approved Cory Cantrell

23   for work release, right?

24   A.          Yes.

22

```
1    Q.          Okay.  In your report -- you wrote on

2    page 10 of your report, you wrote that the jail

3    staff allowed Mr. Cantrell to be on work release.

4              Is that right?

5    A.          Yes, that's correct.

6    Q.          But the work release was court ordered,

7    right?

8    A.          Yes, it was.

9    Q.          Okay.  The jail's got to follow the

10   court orders, correct?

11   A.          Yes.

12   Q.          Okay.  And on April 7th, 2022, Cory

13   Cantrell overdosed while he was on work release,

14   correct?

15   A.          I think when he returned from work

16   release.

17   Q.          Okay.  What -- what's your basis --

18   well, strike that.

19              Based on your review of the records, do

20   you recall Cory Cantrell overdosing outside the

21   jail while he was on work release?

22   A.          Yes, I do.

23   Q.          Okay.  And at the time he was on work

24   release and outside the jail, he wasn't under the
```

1   supervision of the Scioto County Sheriff's Office,

2   correct?

3   A.          I'm not sure whose supervision he was

4   under.

5   Q.          Okay.  After he overdosed outside the

6   jail, he was furloughed for treatment at a

7   hospital called Southern Ohio Medical Center,

8   correct?

9   A.          Correct.

10  Q.          And he was instructed to report back to

11  the jail after they released him, correct?

12  A.          Yes.

13  Q.          Okay.  And so the medical staff at the

14  Southern Ohio Medical Center on April 7th cleared

15  Cantrell for release, correct?

16  A.          That's correct, back to the jail.

17  Q.          Back to the jail.  And when he came

18  back to the jail, since he had been furloughed, he

19  was rebooked as, like, a new prisoner on

20  April 7th, 2022, correct?

21  A.          I don't recall that, but I know he was

22  returned back to the jail.

23  Q.          Okay.  Do you recall reviewing a new

24  set of booking records on -- from April 7th, 2022?

24

```
 1    A.         No.

 2    Q.         Okay.

 3    A.         Not at this point.

 4    Q.         All right.  All right.  Now we're

 5    getting to things in the jail.

 6               On April 9th, 2022, at 2:55 a.m.,

 7    Cantrell was found unresponsive in holding cell

 8    five, correct?

 9    A.         Correct.

10    Q.         Okay.  And Officers Tackett and Carver

11    administered Narcan to Mr. Cantrell, correct?

12    A.         Yes.

13    Q.         And then Cantrell was transported to

14    the hospital Southern Ohio Medical Center,

15    correct?

16    A.         Yes.

17    Q.         All right.  You don't have any issue

18    with how Officers Tackett and Carver responded to

19    Mr. Cantrell's overdose, correct?

20    A.         No.

21    Q.         Okay.  After Cantrell went to the

22    hospital, a search of holding cell five was

23    conducted at 8:22 a.m., correct?

24    A.         I'm not aware of that, but yeah.
```

1  Q.        All right.  Well, let's take a look at

2  that.  Okay.  I'm going to share my screen with

3  you.

4  A.        Okay.

5  Q.        Standby.  See if I can do this.  Share.

6            Okay.  You should see something that

7  looks like an incident report on your screen.

8            Do you see that?

9  A.        Yes, I do.

10                    - - - - -

11          Thereupon, Defendants' Exhibit 1 is marked

12  for purposes of identification.

13                    - - - - -

14  Q.        Okay.  So we're talking about

15  April 9th, 2022.  And my question -- this will be

16  exhibit -- this can be Exhibit 1.  I should write

17  that down.

18            Go ahead and take a look at that and

19  tell me when you've read it.

20  A.        Okay.  Yes, I read it.

21  Q.        Okay.  So you've had a chance to take a

22  look at what we've marked as Exhibit 1, an

23  incident report from April 9th at 8:22 --

24  April 9th, 2022, at 8:22.

26

```
 1              And my question was:  A search of
 2   holding cell five was conducted at 8:22, correct?
 3   A.         That's correct.
 4   Q.         Okay.  And the search revealed that a
 5   toilet paper role had tissue paper stuffed on each
 6   end, correct?
 7   A.         Yes.
 8   Q.         And inside there was an object wrapped
 9   in black electrical tape, correct?
10   A.         That was found, yes.
11   Q.         Okay.  And so what the corrections
12   officers did was collect that as evidence for
13   analysis and turned it over to the detective
14   bureau, correct?
15   A.         Correct.
16   Q.         Okay.  And because Mr. Cantrell had
17   overdosed in holding cell five, it was reasonable
18   and appropriate to search holding cell five,
19   collect any contraband and turn it over to
20   detectives for further investigation, correct?
21   A.         Yes.
22   Q.         About 12 hours later, at 8:46 p.m.,
23   Officer Ness caught inmates from holding cell six
24   trying to slide a crystal-like substance to a
```

1    female outside of the holding cells who was on the

2    phone, correct?

3    A.        I'm sorry, repeat that question again.

4    Q.        Sure.  You know what, let's also --

5    we'll just move to -- so I've moved down to an

6    incident report dated April 9th, 2022, at 2046, or

7    8:46.

8              Why don't you take a look at that

9    incident report.

10   A.        Okay.

11   Q.        Tell me when you're ready.

12   A.        Okay.

13   Q.        You reviewed these incident reports as

14   part of your review of the case, correct?

15   A.        Yes.

16   Q.        Okay.  So at 8:46 p.m. on April 9th,

17   2022, Officer Ness catches inmates from holding

18   cell six trying to slide a crystal-like substance

19   to a female who's outside of the holding cells and

20   on the phone, correct?

21   A.        Yes.

22   Q.        And then officers searched holding cell

23   six and recovered a clear baggie with a

24   brownish-white substance and a black ball of tape,

28

1   correct?

2   A.        Yes.

3   Q.        And the crystal-like substance and

4   brownish-white substance were turned over to the

5   detective bureau for further analysis and

6   investigation, correct?

7   A.        That's correct.

8   Q.        Okay.  And so this incident shows that

9   officers at the jail, they're watching for

10  potential contraband, correct?

11  A.        Yes.

12            MR. GREEN:  Objection.

13            You can answer.

14  Q.        Okay.  And when any contraband is

15  found, the officers are searching the cell from

16  which it came, and that's reasonable and

17  appropriate, correct?

18            MR. GREEN:  Objection.

19            You can answer.

20  A.        Yes.

21  Q.        And the officers are also turning over

22  the contraband to detectives for further

23  investigation, correct?

24  A.        Yes.

29

1    Q.          And when you -- when you were working

2    in the jail and prison system in California, when

3    the corrections officers found contraband, did

4    they then turn it over to investigators or

5    detectives to then build a case?

6    A.          Yes.

7    Q.          Okay.  Back to Cantrell who's at the

8    hospital.

9               When Cantrell returns from the hospital

10   on April 9th, 2022, he's placed on suicide watch,

11   correct?

12   A.          Yes.

13   Q.          Okay.  And while he was on suicide

14   watch, he's checked every 10 minutes, correct?

15   A.          Yes.

16   Q.          Okay.  And in your experience as a law

17   enforcement officer, people take drugs for various

18   reasons, correct?

19   A.          Yes, they do.

20   Q.          Some people take drugs to get high and

21   make themselves feel good, correct?

22   A.          Yes.

23   Q.          Some people take drugs to hurt

24   themselves, correct?

1   A.          That might be possible, yes.

2   Q.          And some people take drugs because

3   they're addicted to drugs, correct?

4   A.          Yes.

5   Q.          You reviewed the hospital records in

6   this case, right?

7   A.          On which instance?

8   Q.          Well, let's start with on April 9th

9   when he -- the first time he was sent to the

10  hospital from the jail.

11  A.          I don't think I -- I recall reviewing

12  the medical reports of that situation.

13  Q.          All right.  Well, let's take a look.

14              Would you have wanted to review the

15  hospital records?

16  A.          Not necessarily, no.

17                         - - - - -

18              Thereupon, Defendants' Exhibit 2 is marked

19  for purposes of identification.

20                         - - - - -

21  Q.          Okay.  Okay.  You should see a record,

22  that first line is personal valuables.

23              Do you see that?

24  A.          Can you enlarge it a little bit?

1   Q.          Yeah.

2               MR. GREEN:  Andy, what exhibit is this,

3   2 or 3?

4               MR. YOSOWITZ:  This will be 2.

5               MR. GREEN:  Okay.

6   A.          A bit larger, please.

7   Q.          All right.  How's that?

8   A.          That's great.

9   Q.          Okay.  So I'm showing you what we've

10  identified as Exhibit 2.  I'll represent to you

11  that these are medical records from Southern Ohio

12  Medical Center dated April 9th, 2022.  I

13  understand that you didn't review these?

14  A.          I don't recall, no.

15  Q.          Okay.  I just wanted to -- okay.  So in

16  this part of the record for Mr. Cantrell, it

17  indicates that he suffered an accidental overdose.

18              Do you see that?

19  A.          I do see it.

20  Q.          And that the context of the accidental

21  overdose was "wanted to get high."

22              Do you see that?

23  A.          Yes.

24  Q.          Okay.  And as we discussed in your

32

1    experience as a law enforcement officer, that's

2    one reason that people take drugs, right?

3    A.        Yes.

4    Q.        Okay.  Regardless, the jail decided to

5    put Cantrell on suicide watch until he was cleared

6    by mental health, correct?

7    A.        Yes.

8    Q.        And even though he said or he told the

9    medical staff at the hospital that he wanted to

10   get high, it was still reasonable and appropriate

11   to put Mr. Cantrell on suicide watch when he

12   returned from the hospital on April 9th, correct?

13   A.        Yes.  I have no issue with that.

14   Q.        Okay.  And so Mr. Cantrell was then

15   seen by Shawnee Mental Health on April 10th

16   between 7:36 and 7:52 a.m., correct?

17   A.        Yes.

18   Q.        And the mental health professional for

19   Shawnee Mental Health did not believe that

20   Cantrell was a continuing suicide risk and

21   instructed the jail staff to follow the protocol

22   for a non-suicidal inmate, correct?

23   A.        Yes.

24   Q.        Okay.  And then about 10 minutes later,

33

1    officers attempted to place Mr. Cantrell into

2    holding cell six and he refuses to go in, right?

3    A.         That's correct.

4    Q.         And that's when he says, fuck it, I'm

5    going to go in here and overdose again, correct?

6    A.         Yes.

7    Q.         And the officers placed Mr. Cantrell in

8    a restraint chair until he calmed down, correct?

9    A.         Correct.

10   Q.         You don't have any issue with that,

11   right?

12   A.         No.

13   Q.         Eventually, Mr. Cantrell does go into

14   holding cell six, right?

15   A.         Yes.

16   Q.         Okay.  This is the same holding cell

17   that just had recently been searched by the

18   corrections officers, correct?

19   A.         Yes.

20   Q.         There was no reason for the officers to

21   suspect that there were still drugs in holding

22   cell six, correct?

23              MR. GREEN:  Objection.

24              You can answer.

1    A.          Whatever the reasons were, safety and

2    security of the facility and the inmates and

3    staff.

4    Q.          Right.  My question was:  The officers

5    had just recently searched this cell.  At the time

6    that they put Mr. Cantrell back in on April 10th,

7    they didn't -- they didn't have any evidence that

8    there were still drugs in that holding cell,

9    correct?

10             MR. GREEN:  Objection.

11   A.          No.

12             MR. GREEN:  You can answer.

13   A.          Not that I'm aware of.

14   Q.          So even if one interprets the

15   statement, "fuck it, I'm going to go in here and

16   overdose again" as a statement of potential

17   self-harm, the officers who were there knew that

18   Cantrell had just been seen by a mental health

19   professional and released from suicide watch 10

20   minutes earlier, right?

21   A.          Correct.

22   Q.          Okay.  And then there's no evidence

23   that Cantrell made any further statements to the

24   officers of self-harm on April 10th, 2022,

35

1    correct?

2    A.        Correct.

3    Q.        What the officers didn't know at the

4    time is that Cantrell had drugs stashed in his

5    rectum, correct?

6    A.        Wasn't --

7              MR. GREEN:  Objection.

8    A.        -- aware of that.

9    Q.        You're not aware that Cory Cantrell had

10   drugs stashed in his rectum?

11   A.        Oh, yes, okay.

12             MR. GREEN:  Objection.

13   A.        I'm sorry.  I apologize.  I was aware

14   of that.

15   Q.        Okay.  Well, and we're going to talk

16   about that in a little bit more detail.

17             At 4:30 a.m. the next day, April 11th,

18   the officers hear screaming and banging from

19   holding cell six, correct?

20   A.        Uh-huh, yes.

21   Q.        And when they arrive, they see Cantrell

22   rolling around on his mat screaming, right?

23   A.        Yes.

24   Q.        He's not responding to them, right?

1    A.        Yes.

2    Q.        And they administer Narcan and have him

3    transported to the hospital, correct?

4    A.        Yes.

5    Q.        Okay.  And you don't have any

6    criticisms of the officers' response to Cantrell's

7    overdose on April 11th, 2022, correct?

8    A.        No.

9    Q.        So at the hospital, Cantrell admits

10   that he had drugs in his rectum and they had been

11   there for about a week, correct?

12   A.        Yes.

13   Q.        And, in fact, he stated that he had

14   been unable to have a bowel movement because it

15   was, quote, up pretty high, end quote, correct?

16   A.        Yes.

17   Q.        In fact, the hospital couldn't even see

18   the drugs on their CT scan, correct?

19   A.        Yes, that's my understanding.

20   Q.        And correctional officers are not

21   radiologists, correct?

22   A.        No, they're not.

23   Q.        Even with scanning technology, it's

24   difficult to see drugs inside someone's rectum or

37

1    bowels, correct?

2    A.        Yes.

3    Q.        In your years of correctional work, did

4    you ever have inmates put things in their rectum?

5    A.        Yes.

6    Q.        Okay.  What kinds of things did they

7    put in their rectum?

8    A.        Oh, could be weapons, it could be

9    drugs.

10   Q.        All right.  So now we're at April 11th,

11   2022, when Cantrell's now back at the jail from

12   the hospital.

13   A.        Uh-huh.

14   Q.        Between -- well, and let me just -- the

15   date -- the date that Cantrell overdoses and dies

16   is June 18th, 2022, right?

17   A.        Correct.

18   Q.        Okay.  So between April 11th, 2022, and

19   June 17th, 2022, there's nothing in the record

20   that you reviewed showing that Cantrell used drugs

21   in the Scioto County Jail, correct?

22   A.        Yes.

23   Q.        So after the drugs are removed from his

24   rectum -- strike that.

38

```
 1              After the drugs are removed from
 2    Cantrell's rectum on April 11th, 2022, and before
 3    Perry Steele smuggles in drugs in his rectum on
 4    June 18th, 2022, there's no evidence that Cantrell
 5    used any illegal drugs at the Scioto County Jail,
 6    correct?
 7    A.         Yes, it is.
 8    Q.         There was another incident on
 9    April 15th, 2022.  Cantrell jumped off the top
10    range of one of the housing pods, correct?
11    A.         Yes.
12    Q.         And he's taken to the hospital for
13    evaluation, right?
14    A.         Yes.
15    Q.         It's certainly reasonable to send him
16    to the hospital, correct?
17    A.         Yes.
18    Q.         And when he comes back from the
19    hospital, he's placed on suicide watch again,
20    correct?
21    A.         Yes.
22    Q.         And it's reasonable to place him on
23    suicide watch because he just jumped off a tier,
24    correct?
```

39

1    A.          Yes, it is.

2    Q.          Okay.  And he's evaluated by Shawnee

3    Mental Health that same day that he comes back

4    from the hospital, correct?

5    A.          Yes.

6    Q.          And he tells them, Shawnee Mental

7    Health, that he's not suicidal, correct?

8    A.          Yes.

9    Q.          The mental health professional wrote

10   that Cantrell could return to general population,

11   correct?

12   A.          Yes.

13   Q.          And the mental health professionals

14   know more about mental health than the corrections

15   officers do, correct?

16   A.          Yes, they do.

17   Q.          Okay.  And that's why corrections

18   sheriff's departments and prisons have mental

19   health professionals to assess inmates who might

20   be suicidal or not, correct?

21   A.          Yes, that's -- that is correct.

22   Q.          At -- you read -- you said you read

23   Captain Roberts' deposition, right?

24   A.          Yes.

40

1    Q.        Okay.  And Captain Roberts is the --

2    what we call the jail administrator of the Scioto

3    County Jail, correct?

4    A.        Yes.

5    Q.        Other jurisdictions might refer to that

6    person as a warden.  Do you understand that?

7    A.        I've never heard that director of

8    corrections or --

9    Q.        Right.

10   A.        But I've never heard to them referred

11   to as the warden of a jail.

12   Q.        Okay.  But you understand that he

13   oversees the jail, correct?

14   A.        Yes.

15   Q.        All right.  And I know you haven't been

16   to the jail, but based on his testimony, you

17   understand that all of the housing pods at the

18   Scioto County Jail are two-tiered, correct?

19   A.        Yes.

20   Q.        Meaning there's an upper level and a

21   lower level, correct?

22   A.        Lower level and upper level, yes.

23   Q.        And the only place in the jail that's

24   not two-tiered is the booking area with the

1    holding cells, correct?

2    A.          Yes.

3    Q.          And so because Cantrell jumped off a

4    second tier, it would not be reasonable or smart

5    to continue to house him in a multilevel housing

6    area, correct?

7    A.          Well, that could be one of the

8    considerations, yes.

9    Q.          It's reasonable to house him in the

10   booking area where there's more supervision and no

11   opportunity for him to jump, correct?

12   A.          Correct.

13   Q.          Did you review Mr. Cantrell's jail

14   medical records?

15   A.          No, I don't recall reviewing the

16   medical records.

17   Q.          Okay.  Did you know that inmates have

18   to be -- undergo a physical examination in Ohio

19   within two weeks of their admission to the jail?

20   A.          A physical examination?

21   Q.          Correct.

22   A.          No, I wasn't aware of that.

23   Q.          Okay.  Well, so because you didn't look

24   at the records, you're not -- you don't know that

42

1    Cantrell was examined by the nursing staff on

2    April 21st, 2022, correct?

3    A.          No.

4    Q.          Okay.  And you don't know that part of

5    that examination was a suicide risk assessment,

6    correct?

7    A.          No, I don't.

8    Q.          Okay.  And you don't know that during

9    that examination, Cantrell denied that he had

10   thoughts of killing himself, correct?

11   A.          Yes.

12   Q.          Right, you did -- and Cantrell was

13   offered the opportunity to speak -- strike that.

14              You don't know, because you didn't look

15   at the record, that Cantrell was offered the

16   opportunity to speak to a mental health

17   professional and declined that, correct?

18   A.          I'm not aware of that, no.

19   Q.          Okay.  In your report, you write that

20   jail officers and personnel did not follow policy

21   753, which is the medical policy, and 757, which

22   is the suicide prevention policy, correct?

23   A.          Correct.

24   Q.          Which jail staff were you referring to?

43

```
 1    A.          The staff that took him from his cell
 2    to the -- what is it, the holding cell six.
 3    Q.          Okay.
 4    A.          They removed him from the cell.
 5    Q.          Okay.  So the holding cell six was not
 6    the cell that he was ultimately in.  You're --
 7    so --
 8    A.          Excuse me.  Cantrell was moved from his
 9    cell that the officers felt that he was a suicide
10    risk.
11    Q.          Okay.  What day are you referring to
12    that this move happened on?
13    A.          I don't recall the exact date at this
14    point, but --
15    Q.          As we've discussed, each time that
16    Cantrell was on suicide watch, a mental health
17    professional released him from suicide watch,
18    correct?
19    A.          It requires release by a mental health
20    professional, yes.
21    Q.          That's right.  Even if the corrections
22    officers wanted to release him from suicide watch,
23    they couldn't do it without a mental health
24    professional signing off, correct?
```

1    A.        Correct.

2    Q.        All right.  Once the -- once the mental

3    health staff has made a determination that

4    Mr. Cantrell is not suicidal, there's nothing in

5    the suicide prevention policy that requires the

6    mental health permission to move an inmate from

7    one cell to another, correct?

8    A.        Right.

9    Q.        Because at that point, he's just on --

10   he's just in general population, correct?

11   A.        Yes.

12   Q.        Okay.  And after April 15th, which was

13   the date that he jumped from the second tier,

14   there's no evidence that Mr. Cantrell made any

15   statements of suicidal ideation, correct?

16   A.        Yes, that's correct.

17   Q.        Okay.  And the -- similarly, the

18   medical policy, there's nothing in that policy

19   that requires permission of the medical staff to

20   move an inmate to or from a holding cell, correct?

21   A.        I'm sorry, ask that question again.

22   Q.        Sure.  Nothing in the medical policy,

23   which was 753, that requires the permission of the

24   medical staff to move an inmate to a holding cell,

1    correct?

2              MR. GREEN:  Objection.

3              You can answer.

4    A.        Correct.

5    Q.        Okay.  All right.  You understand that

6    an inmate named Perry Steele was alleged to have

7    brought drugs in to the Scioto County Jail,

8    provided those drugs to Cory Cantrell, and

9    Cantrell overdosed on those drugs, correct?

10   A.        Yes.

11   Q.        And, in fact, Perry Steele was

12   criminally charged with manslaughter and went to

13   trial on that case, correct?

14   A.        Yes.

15   Q.        Okay.  I want to talk about, first,

16   body cavity searches.

17             Are you familiar with those?

18   A.        Yes, I am.

19   Q.        All right.  And you understand that in

20   order to perform a body cavity search, there has

21   to be probable cause that the person currently has

22   drugs in a body cavity, correct?

23   A.        Yes.

24   Q.        And a body cavity search requires a

1   search warrant signed by a judge or a magistrate,

2   correct?

3   A.          No, not to my knowledge.  It's a

4   custody decision based on custody personnel.

5   Q.          So as we sit here today, it's your

6   understanding that a body cavity search could be

7   conducted without a warrant?

8   A.          To my knowledge, yes, that's correct.

9   Q.          Okay.  If -- well, you're not familiar

10  with all of Ohio's laws, correct?

11  A.          No, I am not.

12  Q.          Okay.  You haven't worked as a

13  corrections officer in Ohio, correct?

14  A.          Correct.

15  Q.          So you would not know that there's an

16  Ohio statute which states that a body cavity

17  search requires a warrant, correct?

18  A.          I'm not aware of that, no.

19  Q.          And certainly if that's the law in

20  Ohio, corrections officers in Ohio would be bound

21  to follow that law, correct?

22  A.          Yes.

23  Q.          Okay.  The mere fact that an inmate is

24  arrested on a drug charge does not provide

47

1    probable cause to do a body cavity search,

2    correct?

3                    MR. GREEN:  Objection.

4                    You can answer.

5    A.              Well, it depends on the decision of

6    custody; if they want to do a more thorough search

7    of the arrestee.

8    Q.              Okay.  Okay.  I'm going to represent to

9    you that Ohio Revised Code §2933.32 states that

10   unless there's a legitimate medical reason or

11   medical emergency justifying a warrantless search,

12   a body cavity search shall be conducted only after

13   a search warrant is issued that authorizes the

14   search.

15                   Okay?

16   A.              Okay.  Let me clarify something on your

17   question.  Are you talking about an intrusion body

18   cavity search?

19   Q.              Oh, yes.  Yes.

20   A.              Okay.  I'm sorry, I thought you just

21   meant a strip search.

22   Q.              No.  No.  And maybe that's good that we

23   clarified that.

24                   So a strip search, based on my

48

1    understanding of what they do at the Scioto County

2    Jail and other jails in Ohio, is where they

3    observe the inmate remove their clothing, it has

4    to be an officer of the same sex, and then they'll

5    typically have the inmate squat and cough?

6    A.        Yes.

7    Q.        And they will also, for females,

8    have -- like have them lift their breasts and then

9    the inmate will take a shower and be issued jail

10   clothing.  Is that what you understand a strip

11   search to be?

12   A.        I don't know about issuing showering

13   and all that, but I understand what a strip search

14   is, yes.

15   Q.        Okay.  A body cavity search is actually

16   going into the body cavity of a person and pulling

17   out whatever you find?

18   A.        Yes.

19   Q.        Okay.  Does that -- to go into

20   somebody's body cavity, does that require a

21   warrant in California?

22   A.        Not that I recall.  Requires medical

23   personnel to do that.

24   Q.        Okay.

49

1    A.        But I don't recall a warrant required.

2    Q.        You're familiar with the concept of

3    probable cause for a warrant, correct?

4    A.        Yes, I am.

5    Q.        You've applied for search warrants

6    before, correct?

7    A.        Not that I recall.  Not as a warden or,

8    you know, in administration.

9    Q.        Okay.  Well, there was no indication on

10   Perry Steele's June 18th, 2022, body scan that he

11   was secreting any contraband or drugs in his

12   rectum, correct?

13   A.        That's correct.

14   Q.        Prior to Cory Cantrell's overdose,

15   corrections officers did not have any information

16   that Perry Steele was secreting drugs in his

17   rectum, correct?

18   A.        Correct.

19   Q.        And then on the -- on June 18th, 2022,

20   the other inmates in the holding cell with Cory

21   Cantrell didn't summon assistance until Cantrell

22   started foaming at the mouth, correct?

23   A.        Yes.

24   Q.        And as soon as the inmates summoned

1    assistance, officers got Cantrell out of the cell

2    and began performing CPR, correct?

3    A.          Yes.

4    Q.          Officers performed CPR on Mr. Cantrell

5    until the paramedics arrived, correct?

6    A.          Yes.

7    Q.          And it was reasonable and appropriate

8    to perform CPR on Cory Cantrell, correct?

9    A.          Yes.

10   Q.          The officers retrieved and applied an

11   automated external defibrillator to Cory Cantrell,

12   correct?

13   A.          I don't recall that the -- that

14   equipment was authorized.  I mean, I don't think

15   there was any indication that should be used to

16   the best of my recollection.

17   Q.          Well, Cory Cantrell was in cardiac

18   arrest, correct?

19   A.          Yes, I believe so.

20   Q.          And you understand that defibrillators

21   are used for people who are in cardiac arrest,

22   correct?

23   A.          That -- it can be used, yes.

24   Q.          Okay.  And the purpose of a

1    defibrillator is to try and restart the heart,

2    correct?

3    A.          Yes.

4    Q.          Okay.  If the video of the

5    resuscitation shows the officers obtaining an

6    automated external defibrillator and applying

7    that, you don't have any reason to dispute that,

8    correct?

9    A.          I didn't see any video of that

10   treatment, no.  But I don't have any objection to

11   it if that's what they decide to do.

12   Q.          You were not provided with the

13   treatment of the -- strike that.

14              You were not provided with the video of

15   the resuscitation?

16   A.          Not to my recollection, no.

17   Q.          Okay.  Well, based on the records that

18   you read, do you have -- do you have -- do you

19   dispute that the officers were trying to save Cory

20   Cantrell's life?

21   A.          Nope.

22   Q.          Okay.  Your criticism of the officers'

23   resuscitative efforts is that they did not

24   administer Narcan, correct?

52

1   A.          No Narcan was administered, that's

2   correct.

3   Q.          But the paramedics didn't administer

4   Narcan either, correct?

5   A.          Not to my recollection, no.

6   Q.          And the doctors at the hospital didn't

7   administer Narcan either, correct?

8   A.          Correct.

9   Q.          You -- you're not a medical

10  professional, correct?

11  A.          That's correct.

12  Q.          You do not know whether the use of

13  Narcan is indicated when a person is in full

14  cardiac arrest, correct?

15  A.          No.  I'm not a medical doctor.  I don't

16  have an opinion on that.

17  Q.          Okay.  In your -- did you -- you had

18  36 years in corrections?

19  A.          Yes, I did.

20  Q.          Okay.

21  A.          In California.

22  Q.          In California.

23              Were there any drug overdoses in any of

24  the correctional facilities that you oversaw?

53

```
 1    A.          Yes.

 2    Q.          Was there ever contraband smuggled into

 3    any of the correctional facilities that you

 4    oversaw?

 5    A.          Yes.

 6    Q.          What's the most unusual technique you

 7    ever saw an inmate use to try and get contraband

 8    in?

 9    A.          An --

10                MR. GREEN:  Objection.

11    A.          -- inmate?

12                MR. GREEN:  You can answer.

13    A.          I'm sorry, I --

14    Q.          Yeah, an inmate?

15    A.          Rectum.

16    Q.          Rectum?

17    A.          Rectum stashes is the most common.

18    Q.          Since you retired from active

19    correction -- you know, active law enforcement

20    duty, you've been, like, a corrections consultant,

21    correct?

22    A.          I have been, yes.

23    Q.          Okay.

24    A.          I am.
```

54

1    Q.        You are?

2    A.        Yes.

3    Q.        Do you know of any correctional

4    facility that's able to keep all contraband out?

5    A.        No, there's not.

6    Q.        Okay.  When's the last time you

7    actually worked full-time in a correctional

8    facility?

9    A.        Been many years.  I think the last time

10   I worked in a facility was in -- I left in 2000.

11   Q.        Okay.  And so then what -- since 2000,

12   what's been your business?  What have you been

13   doing?

14   A.        Well, I've been consulting since 1986

15   to the present.

16   Q.        Okay.  And what percentage -- you

17   obviously do expert work, right?

18   A.        Yes.

19   Q.        What percentage of your work is expert

20   work versus consulting work?

21   A.        I'm not sure if I understand the

22   difference.

23   Q.        Sure.  Let me --

24   A.        Can you be more specific?

1    Q.        Yeah.

2              When I say expert work, I mean when

3    you're testifying as an expert witness in a

4    criminal or civil case.

5    A.        Okay.

6    Q.        Okay.  When I think of consulting, I

7    think of that as you going to a correctional

8    facility and telling them, this is good, you

9    should do this, you should do -- you know, giving

10   them direction on how to do things.

11             Does that make sense?

12   A.        That can happen, yes.

13   Q.        Okay.  So what I was trying to get a

14   sense of is what percentage of your work is doing

15   expert work in criminal and civil cases versus

16   doing consulting work with various jails and

17   prisons?

18   A.        I'm sorry, Counsel, I don't understand

19   your question --

20   Q.        Okay.

21   A.        -- how to respond to that.

22   Q.        All right.  I'll get back to it.

23   A.        Okay.

24   Q.        This will be an easier question.

1   A.          Okay.

2   Q.          Have you ever worked with the law firm

3   Shapero & Green before this case?

4   A.          Not to my recollection, no.

5   Q.          And then how much so far have you been

6   paid on this case?

7   A.          I think it's -- I think it was about

8   9,000 -- 9,000 and some change, 36 hours.

9   Q.          You -- you provide expert services for

10  attorneys who are in civil and criminal cases,

11  correct?

12  A.          Yes.

13  Q.          Okay.  About how much income per year

14  do you derive from that work?

15  A.          Well, it depends how many cases I have.

16  You know, there are sometimes where I've made over

17  100,000 of consulting and sometimes much less than

18  that.

19  Q.          Okay.  Have you ever served as an

20  expert witness on behalf of corrections officers?

21  A.          On behalf -- on behalf?

22  Q.          Sure.  Or on the side of corrections

23  officers?

24  A.          In their defense, is that what

57

1    you're --

2    Q.        Yes.

3    A.        Yes, I have.

4              MR. YOSOWITZ:  Mr. Vasquez, I think

5    that's all the questions I have.

6              THE WITNESS:  Okay.

7              MR. YOSOWITZ:  I appreciate your time.

8    I hope you're feeling better from last week.

9              THE WITNESS:  I am much better.  Much

10   better.

11             MR. YOSOWITZ:  And that's all I've got,

12   Brian.

13             MR. GREEN:  Thank you.  Very good.

14   We'll take a copy if this is typed.

15             (Signature not waived.)

16                      - - - - -

17        Thereupon, the foregoing proceedings

18        concluded at 4:10 p.m.

19                      - - - - -

20

21

22

23

24

58

1  State of Ohio     :        C E R T I F I C A T E
   County of Franklin: SS

2

3      I, Mary Bradley, RPR, CRR, a Notary Public in
   and for the State of Ohio, certify that Daniel
   Vasquez was by me duly sworn to testify to the
4  whole truth in the cause aforesaid; testimony then
   given was reduced to stenotype in the presence of
5  said witness, afterwards transcribed by me; the
   foregoing is a true record of the testimony so
6  given; and this deposition was taken at the time
   and place specified on the title page.

7

8      Pursuant to Rule 30(e) of the Federal Rules of
   Civil Procedure, the witness and/or the parties
   have not waived review of the deposition
9  transcript.

10     I certify I am not a relative, employee,
   attorney or counsel of any of the parties hereto,
11 and further I am not a relative or employee of any
   attorney or counsel employed by the parties
12 hereto, or financially interested in the action.

13     IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Columbus,
14 Ohio, on December 31, 2024.

15

16

17

18

19

20 _____
   Mary Bradley, RPR, CRR, Notary Public - State of
21 Ohio.  My commission expires September 19, 2029.

22

23

24

```
             Witness Errata and Signature Sheet
                Correction or Change Reason Code
        1-Misspelling  2-Word Omitted  3-Wrong Word
          4-Clarification  5-Other (Please explain)

Page/Line          Correction or Change          Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____
```

I, Daniel Vasquez, have read the entire transcript of my deposition taken in this matter, or the same has been read to me.  I request that the changes noted on my errata sheet(s) be entered into the record for the reasons indicated.

Date_____Signature_____

Ref: Mb313319dv

**Exhibits**

**313319 Exhib it 001** 4:5 25:11,16,22

**313319 Exhib it 002** 4:6 30:18 31:10

_____

**1**

**1** 25:11,16,22
**10** 21:15 22:2 29:14 32:24 34:19
**100** 12:5
**100,000** 56:17
**10th** 32:15 34:6,24
**11:05** 16:17
**11th** 35:17 36:7 37:10, 18 38:2
**12** 26:22
**15th** 38:9 44:12
**17th** 37:19
**18** 13:7 16:17
**18th** 13:2 37:16 38:4 49:10,19
**19** 18:14 20:18
**1986** 54:14

_____

**2**

**2** 30:18 31:3, 4,10
**2000** 54:10, 11
**2022** 13:2,7 16:17 17:19, 22 18:4,14 20:18 21:14 22:12 23:20, 24 24:6 25:15,24 27:6,17 29:10 31:12 34:24 36:7 37:11,16,18, 19 38:2,4,9 42:2 49:10, 19
**2023** 8:22 9:7,21
**2046** 27:6
**21st** 42:2
**2:55** 24:6

_____

**3**

**3** 31:3

**36** 52:18 56:8

_____

**4**

**4:10** 57:18
**4:30** 35:17
**4th** 21:14

_____

**7**

**7** 8:22 9:7,20
**721** 13:20
**753** 42:21 44:23
**757** 42:21
**7:36** 32:16
**7:52** 32:16
**7th** 22:12 23:14,20,24

_____

**8**

**8:22** 24:23 25:23,24 26:2
**8:46** 26:22 27:7,16

_____

**9**

**9,000** 56:8
**9th** 24:6 25:15,23,24 27:6,16 29:10 30:8 31:12 32:12

_____

**A**

**a.m.** 16:17 24:6,23 32:16 35:17
**ability** 7:19
**access** 20:12,15
**accidental** 31:17,20
**accurate** 6:14 7:16 8:14
**active** 53:18, 19
**addicted** 30:3
**administer** 36:2 51:24 52:3,7
**administered** 24:11 52:1
**administratio n** 5:5,10 49:8
**administrator** 40:2
**admission** 41:19

**admits** 36:9
**admitted** 10:9
**Adult** 18:5
**afternoon** 5:19
**agree** 10:15 17:1,6 18:7
**ahead** 25:18
**alleged** 45:6
**allowed** 22:3
**analysis** 26:13 28:5
**Andrew** 5:8, 22
**Andy** 31:2
**answers** 6:15,23
**apologize** 35:13
**applied** 49:5 50:10
**applying** 51:6
**approved** 21:22
**April** 21:14 22:12 23:14, 20,24 24:6 25:15,23,24 27:6,16 29:10 30:8 31:12 32:12, 15 34:6,24 35:17 36:7 37:10,18 38:2,9 42:2 44:12
**area** 40:24 41:6,10
**areas** 15:22
**argue** 7:9
**arrest** 15:14, 18 50:18,21 52:14
**arrested** 46:24
**arrestee** 47:7
**arresting** 15:12
**arrive** 35:21
**arrived** 50:5
**assess** 39:19
**assessment** 42:5
**assist** 12:20 17:3
**assistance** 49:21 50:1
**attempted** 33:1
**attention** 20:3,20

**attorney** 5:7 6:7
**attorneys** 9:17 56:10
**authorized** 50:14
**authorizes** 47:13
**automated** 50:11 51:6
**aware** 17:17, 21 18:2 20:22 21:7 24:24 34:13 35:8,9,13 41:22 42:18 46:18

_____

**B**

**back** 23:10, 16,17,18,22 29:7 34:6 37:11 38:18 39:3 55:22
**baggie** 27:23
**ball** 27:24
**banging** 35:18
**based** 10:5 12:10 17:11 22:19 40:16 46:4 47:24 51:17
**basis** 22:17
**bed** 16:21, 22,23
**began** 50:2
**begin** 5:7 8:4,18
**beginning** 8:6
**behalf** 56:20, 21
**bit** 30:24 31:6 35:16
**black** 26:9 27:24
**body** 10:23 11:1,4,8,10, 13,15,19,21, 24 12:1,6, 10,12,18,22 13:2,7,12 15:8 45:16, 20,22,24 46:6,16 47:1,12,17 48:15,16,20 49:10
**booked** 18:13,17,24
**booking** 14:12,18 19:16,21 21:10 23:24 40:24 41:10

**bound** 46:20
**bowel** 36:14
**bowels** 37:1
**breasts** 48:8
**Brian** 5:11 6:7 57:12
**brought** 45:7
**brownish-white** 27:24 28:4
**build** 29:5
**bureau** 18:5 26:14 28:5
**business** 54:12

_____

**C**

**California** 19:1,2,4,7 29:2 48:21 52:21,22
**call** 15:16,17 16:10 40:2
**called** 16:7 23:7
**calmed** 33:8
**candid** 8:14
**Cantrell** 13:3 18:12 19:17 20:18 21:14, 18,22 22:3, 13,20 23:15 24:7,11,13, 21 26:16 29:7,9 31:16 32:5,11,14, 20 33:1,7,13 34:6,18,23 35:4,9,21 36:9 37:15, 20 38:4,9 39:10 41:3 42:1,9,12,15 43:8,16 44:4,14 45:8,9 49:21 50:1,4,8,11, 17
**Cantrell's** 19:12 24:19 36:6 37:11 38:2 41:13 49:14 51:20
**captain** 8:24 39:23 40:1
**cardiac** 50:17,21 52:14
**career** 19:3
**Carver** 24:10,18
**case** 6:2 8:21 9:6 10:7 13:2,6 16:15,16 17:12,18 18:13 27:14

29:5 30:6
45:13 55:4
56:3,6

**cases** 55:15
56:10,15

**catches**
27:17

**caught** 26:23

**cavities** 11:8

**cavity** 12:18
45:16,20,22,
24 46:6,16
47:1,12,18
48:15,16,20

**cell** 13:3
16:5,13,17
24:7,22
26:2,17,18,
23 27:18,22
28:15 33:2,
14,16,22
34:5,8 35:19
43:1,2,4,5,6,
9 44:7,20,24
49:20 50:1

**cells** 16:8
27:1,19 41:1

**Center** 23:7,
14 24:14
31:12

**chair** 33:8

**chance**
25:21

**change** 56:8

**changed** 7:9

**charge** 18:20
19:12 46:24

**charged**
45:12

**charges**
10:22

**checked**
29:14

**civil** 55:4,15
56:10

**Clara** 14:22
16:11

**clarified**
47:23

**clarify** 47:16

**clean** 8:7

**clear** 27:23

**cleared**
23:14 32:5

**client's** 5:23

**clothing** 11:7
14:4 48:3,10

**Code** 47:9

**collect**
26:12,19

**Commission**
20:24 21:3,9

**common**
7:23 53:17

**complete**
6:14 8:4

**compliance**
17:23

**concept** 49:2

**concluded**
57:18

**conduct**
15:13

**conducted**
15:7 16:16
24:23 26:2
46:7 47:12

**conducting**
17:2

**conducts**
15:21

**consideratio
ns** 41:8

**consists**
19:21

**consultant**
53:20

**consulting**
54:14,20
55:6,16
56:17

**contained**
9:6

**context**
31:20

**continue**
41:5

**continuing**
32:20

**contraband**
10:12,16
11:2,12,24
12:7,20 13:7
14:9 15:22
16:5,23
17:4,8,14,24
18:10 26:19
28:10,14,22
29:3 49:11
53:2,7 54:4

**convey** 17:8,
14

**convicted**
21:20

**cooperation**
6:3

**copy** 57:14

**correct** 5:20,
21 6:7,8
9:23,24
10:3,9,13,
14,18,23,24
11:2,8,13,14
12:3,8,9,14,
18,19,23
13:3,8,9,14,
21,22 14:1,
6,9,13,19,24
15:5,9,14,
15,18,23
16:2,5,6,18,
23,24 17:4,

9,15,19,20
18:1,10,15,
18,19 19:2,
4,18,23
20:4,5,9,13,
14,16,17,20,
21 21:5,6,
12,13,16,20
22:5,10,14
23:2,8,9,11,
15,16,20
24:8,9,11,
15,19,23
26:2,3,6,9,
14,15,20
27:2,14,20
28:1,6,7,10,
17,23 29:11,
14,18,21,24
30:3 32:6,
12,16,22
33:3,5,8,9,
18,22 34:9,
21 35:1,2,5,
19 36:3,7,
11,15,18,21
37:1,17,21
38:6,10,16,
20,24 39:4,
7,11,15,20,
21 40:3,13,
18,21 41:1,
6,11,12,21
42:2,6,10,
17,22,23
43:18,24
44:1,7,10,
15,16,20
45:1,4,9,13,
22 46:2,8,
10,13,14,17,
21 47:2
49:3,6,12,
13,17,18,22
50:2,5,8,12,
18,22 51:2,
8,24 52:2,4,
7,8,10,11,14
53:21 56:11

**correction**
53:19

**correctional**
20:24 21:4,9
36:20 37:3
52:24 53:3
54:3,7 55:7

**corrections**
12:11 14:1
20:7,11
26:11 29:3
33:18 39:14,
17 40:8
43:21 46:13,
20 49:15
52:18 53:20
56:20,22

**Cory** 13:3
18:12 20:18
21:14,18,22
22:12,20
35:9 45:8
49:14,20
50:8,11,17
51:19

**cough** 48:5

**counsel** 5:2
55:18

**county** 9:22
10:2,7,21
12:22 13:13,
15,16 15:7,
20 17:9,12,
13,22 18:8,
14 21:15
23:1 37:21
38:5 40:3,18
45:7 48:1

**court** 6:19,24
7:7 21:22
22:6,10

**courtroom**
6:12

**CPR** 50:2,4,8

**create** 11:6

**credibility**
7:11

**criminal**
10:22 15:17
55:4,15
56:10

**criminally**
45:12

**criticism**
51:22

**criticisms**
36:6

**CROSS-
EXAMINATIO
N** 5:17

**crystal-like**
26:24 27:18
28:3

**CT** 36:18

**custody** 46:4
47:6

___

**D**

**Damon** 8:24

**Daniel** 5:14,
19

**date** 37:15
43:13 44:13

**dated** 8:22
9:7,20 27:6
31:12

**day** 35:17
39:3 43:11

**deals** 17:18

**decedent**
18:13

**December**
8:22 9:7,20

**decide** 51:11

**decided** 32:4

**decision**
12:24 13:15
14:20 46:4
47:5

**declined**
42:17

**defendants**
5:9

**Defendants'**
25:11 30:18

**defense**
56:24

**defibrillator**
50:11 51:1,6

**defibrillators**
50:20

**deficient**
9:23

**degree** 11:16
21:1

**denied** 42:9

**density**
12:14

**departments**
39:18

**depends**
47:5 56:15

**deposition**
5:4,6,10,23
7:8 9:1,13,
18 39:23

**derive** 56:14

**detail** 35:16

**detainee**
21:19

**detect** 11:6,
12

**detection**
11:2 12:6,21
17:3,24

**detective**
26:13 28:5

**detectives**
26:20 28:22
29:5

**Detention**
18:5

**determinatio
n** 44:3

**dies** 37:15

**difference**
54:22

**difficult**
12:12,16
36:24

**difficulty**
12:2

**direction**
55:10

**director** 40:7

**discernible**
13:6

**discover**
15:22

**discussed**
9:15 31:24
43:15

**dispute** 51:7,
19

**doctor** 52:15

doctors 52:6
domestic 19:6,8
drug 46:24 52:23
drugs 18:21 29:17,20,23 30:2,3 32:2 33:21 34:8 35:4,10 36:10,18,24 37:9,20,23 38:1,3,5 45:7,8,9,22 49:11,16
duly 5:15
duty 53:20

**E**

earlier 34:20
easier 55:24
efforts 51:23
electrical 26:9
emergency 47:11
emotional 7:15
employees 10:2
end 26:6 36:15
enforcement 15:12 19:3 29:17 32:1 53:19
enlarge 30:24
entered 13:3 14:23
entering 10:7 15:7
enters 12:23
entire 8:4,6
equipment 50:14
essential 17:23
essentially 16:4
evaluated 39:2
evaluation 38:13
events 17:18
Eventually 33:13
evidence 13:5 26:12 34:7,22 38:4 44:14
exact 43:13
examination 41:18,20

42:5,9
examined 42:1
Excuse 43:8
exhibit 25:11,16,22 30:18 31:2, 10
experience 11:21 15:11 29:16 32:1
expert 6:1 8:22 9:6 54:17,19 55:2,3,15 56:9,20
express 5:4
external 50:11 51:6

**F**

facilities 52:24 53:3
facility 34:2 54:4,8,10 55:8
fact 10:11 13:1 36:13, 17 45:11 46:23
failed 10:2
familiar 11:15 13:24 16:1 20:23 45:17 46:9 49:2
feel 29:21
feeling 57:8
felt 43:9
female 27:1, 19
females 48:7
find 48:17
firm 56:2
foaming 49:22
follow 10:2 22:9 32:21 42:20 46:21
foregoing 57:17
form 11:4
found 17:22 24:7 26:10 28:15 29:3
fuck 33:4 34:15
full 52:13
full-time 54:7
furloughed 23:6,18

**G**

general 10:9 14:24 39:10 44:10
give 6:2,14 7:15,22 8:12
giving 55:9
good 5:19 29:21 47:22 55:8 57:13
great 31:8
Green 5:11 6:7,21 28:12,18 31:2,5 33:23 34:10,12 35:7,12 45:2 47:3 53:10, 12 56:3 57:13
guideline 21:8

**H**

happen 55:12
happened 43:12
health 32:6, 15,18,19 34:18 39:3, 7,9,13,14,19 42:16 43:16, 19,23 44:3,6
Healthcare 20:24 21:4,9
hear 35:18
heard 16:8 40:7,10
heart 51:1
hidden 11:7 12:17
hide 16:22
high 29:20 31:21 32:10 36:15
hired 9:17
holding 16:17 24:7, 22 26:2,17, 18,23 27:1, 17,19,22 33:2,14,16, 21 34:8 35:19 41:1 43:2,5 44:20,24 49:20
hope 57:8
hospital 23:7 24:14,22 29:8,9 30:5, 10,15 32:9, 12 36:3,9,17 37:12 38:12,

16,19 39:4 52:6
hours 26:22 56:8
house 41:5,9
housing 15:21 16:13 38:10 40:17 41:5
How's 31:7
human 11:12
hurt 29:23

**I**

ideation 44:15
identification 25:12 30:19
identified 31:10
identify 5:2
illegal 38:5
illegally 17:8,14
image 11:6
imagine 15:3
impair 7:19
important 6:11 17:7
inadequate 9:23
incident 15:17 25:7, 23 27:6,9,13 28:8 38:8
income 56:13
indication 49:9 50:15
influence 7:18
informal 6:10
information 8:12 13:10 18:3 20:9 49:15
initial 10:20 15:8
inmate 12:23 16:14 19:23 20:8 21:12 32:22 44:6, 20,24 45:6 46:23 48:3, 5,9 53:7,11, 14
inmate's 20:12,16
inmates 10:12,16,21 13:12,17,20 14:12,18,23 15:7 16:22 17:7,13

26:23 27:17 34:2 37:4 39:19 41:17 49:20,24
inside 11:12, 24 26:8 36:24
inspected 17:22
inspection 18:5
instance 30:7
instructed 23:10 32:21
intend 9:5
intended 11:23
interest 6:14
interprets 34:14
introduction 18:9
intrusion 47:17
investigation 26:20 28:6, 23
investigators 29:4
issue 24:17 32:13 33:10
issued 16:21 47:13 48:9
issuing 48:12
items 11:7

**J**

jail 10:2,7,22 12:22,23 13:13,16 14:20,22 15:8 16:11 17:9,15,22, 23 18:8,10, 14 21:10,15 22:2,21,24 23:6,11,16, 17,18,22 24:5 28:9 29:2 30:10 32:4,21 37:11,21 38:5 40:2,3, 11,13,16,18, 23 41:13,19 42:20,24 45:7 48:2,9
jail's 22:9
jails 11:11 48:2 55:16
January 18:14 20:18
judge 6:3,12 7:10 46:1

jump 41:11

jumped 38:9, 23 41:3 44:13

June 13:2,7 16:17 37:16, 19 38:4 49:10,19

jurisdictions 40:5

jury 6:3,13 7:10

justifying 47:11

**K**

killing 42:10

kinds 37:6

knew 34:17

knowledge 11:10 46:3,8

**L**

lack 12:13

language 8:14

larger 31:6

law 15:11,17 19:3 29:16 32:1 46:19, 21 53:19 56:2

laws 46:10

left 54:10

legitimate 47:10

level 40:20, 21,22

life 51:20

lift 48:8

listed 8:21

listening 6:3, 13

locate 11:23

longer 21:19

loud 6:23

lower 40:21, 22

**M**

made 34:23 44:3,14 56:16

magistrate 46:1

make 7:5,6 9:9 29:21 55:11

mandates 21:10

manner 8:13

manslaughter 45:12

marked 25:11,22 30:18

mat 35:22

materials 8:20 12:2

mats 16:21, 22,23

mattresses 16:21

meaning 7:23,24 40:20

meant 47:21

medical 19:17,20 20:2,9,12, 15,16,19 21:11 23:7, 13,14 24:14 30:12 31:11, 12 32:9 41:14,16 42:21 44:18, 19,22,24 47:10,11 48:22 52:9, 15

members 17:7,14

memory 19:13

mental 7:14 32:6,15,18, 19 34:18 39:3,6,9,13, 14,18 42:16 43:16,19,23 44:2,6

mere 46:23

metallic 11:6

method 17:3

millimeter 11:5

minutes 29:14 32:24 34:20

missed 14:15

months 21:15

mouth 49:22

move 27:5 43:12 44:6, 20,24

moved 27:5 43:8

movement 36:14

multilevel 41:5

multiple 10:8

**N**

named 45:6

Narcan 24:11 36:2 51:24 52:1, 4,7,13

National 20:23 21:3,8

necessarily 30:16

Ness 26:23 27:17

non-metallic 11:7

non-suicidal 32:22

nonverbal 6:24

northern 19:2

noticing 5:7

nursing 42:1

**O**

oath 5:6,10 8:10

object 26:8

objection 28:12,18 33:23 34:10 35:7,12 45:2 47:3 51:10 53:10

observations 19:22

observe 48:3

observed 14:5

obtaining 51:5

obvious 20:6

occupied 16:13

occurred 17:19

offer 9:6

offered 42:13,15

Office 9:22 10:3 15:20 23:1

officer 14:5 15:12 16:16, 20 19:21 20:7 26:23 27:17 29:17 32:1 46:13 48:4

officer's 20:8

officers 15:12 20:11 21:10 24:10, 18 26:12

27:22 28:9, 15,21 29:3 33:1,7,18,20 34:4,17,24 35:3,18 36:20 39:15 42:20 43:9, 22 46:20 49:15 50:1, 4,10 51:5,19 56:20,23

officers' 36:6 51:22

Ohio 17:24 21:7 23:7,14 24:14 31:11 41:18 46:13, 16,20 47:9 48:2

Ohio's 46:10

operated 11:19

opine 9:21

opinion 10:1 52:16

opinions 9:5

opportunity 5:24 7:4 41:11 42:13, 16

order 19:13 45:20

ordered 22:6

orders 19:7 22:10

originally 18:13

overdose 24:19 31:17, 21 33:5 34:16 36:7 49:14

overdosed 22:13 23:5 26:17 45:9

overdoses 37:15 52:23

overdosing 22:20

oversaw 52:24 53:4

oversees 40:13

**P**

p.m. 26:22 27:16 57:18

paid 56:6

paper 26:5

paramedics 50:5 52:3

part 27:14 31:16 42:4

pat-down 15:8

people 29:17,20,23 30:2 32:2 50:21

percent 12:5

percentage 54:16,19 55:14

perfect 12:7

perform 45:20 50:8

performed 50:4

performing 50:2

permission 44:6,19,23

Perry 13:1,7 38:3 45:6,11 49:10,16

person 40:6 45:21 48:16 52:13

person's 11:24 12:18

personal 30:22

personnel 42:20 46:4 48:23

phone 27:2, 20

physical 7:14 41:18, 20

pick 12:13, 17

picking 12:2

pills 12:13, 17

place 5:5 33:1 38:22 40:23

plaintiff 5:11

pods 38:10 40:17

point 19:15 21:18 24:3 43:14 44:9

policies 9:22 10:3,6 18:8 21:4

policy 10:11 13:19 42:20, 21,22 44:5, 18,22

population 10:9 14:24 39:10 44:10

possibly 8:14

potential 28:10 34:16

powders 12:13,17

practices 18:9 21:5

preliminary 19:17,20 20:1 21:11

prepare 9:12

prepared 6:1

present 54:15

pretrial 5:24 21:19

pretty 36:15

prevent 15:22 18:9

prevention 42:22 44:5

prior 21:11 49:14

prison 29:2

prisoner 10:7 14:4 15:13 21:20 23:19

prisons 11:11 39:18 55:17

probable 45:21 47:1 49:3

probation 18:17,21,24

problem 20:3,19

procedures 9:22 10:3,6

proceedings 57:17

process 10:13,17 14:12,18 19:16

produce 6:20 8:7

professional 32:18 34:19 39:9 42:17 43:17,20,24 52:10

professionals 39:13,19

prosecute 17:7,13

protection 19:7,8,13

protocol 32:21

provide 20:8 46:24 56:9

provided 18:4 45:8 51:12,14

pulling 48:16

purpose 20:1 50:24

purposes 25:12 30:19

put 10:23 32:5,11 34:6 37:4,7

puts 21:4

_____

Q

question 5:24 7:8 8:4, 6,12 14:15 25:15 26:1 27:3 34:4 44:21 47:17 55:19,24

questions 6:16 7:11 8:17,18 19:22 57:5

quote 36:15

_____

R

radiation 11:5

radiologists 36:21

raise 7:11

range 38:10

rays 11:5

re-reviewed 9:14

read 13:10, 19 25:19,20 39:22 51:18

ready 27:11

reason 6:22 7:15 32:2 33:20 47:10 51:7

reasonable 10:17 12:21 14:11,17 17:2 18:8 26:17 28:16 32:10 38:15, 22 41:4,9 50:7

reasons 18:23 29:18 34:1

rebooked 23:19

recall 18:6, 23 22:20 23:21,23 30:11 31:14 41:15 43:13 48:22 49:1,7 50:13

recent 11:11

recently 33:17 34:5

reception 10:13,17

recollection

50:16 51:16 52:5 56:4

record 5:3 6:22 8:7 30:21 31:16 37:19 42:15

records 17:11 20:12, 16 22:19 23:24 30:5, 15 31:11 41:14,16,24 51:17

recovered 27:23

rectum 35:5, 10 36:10,24 37:4,7,24 38:2,3 49:12,17 53:15,16,17

refer 40:5

referred 40:10

referring 42:24 43:11

refresh 19:13

refuses 33:2

regulation 21:8

release 21:23 22:3, 6,13,16,21, 24 23:15 43:19,22

released 23:11 34:19 43:17

relevant 16:15

relying 20:8

remote 5:5,6, 9,10

remove 14:4 15:22 48:3

removed 37:23 38:1 43:4

reopen 7:8

repeat 8:5 27:3

report 6:1 8:22,23 9:6, 10,20 13:11 18:5 20:19 22:1,2 23:10 25:7,23 27:6,9 42:19

reporter 5:1 6:20,24

reporting 5:6

reports 9:15 13:4 27:13 30:12

represent 5:3 31:10

47:8

requests 8:12

require 48:20

required 49:1

requires 8:11 10:11 20:3 43:19 44:5,19,23 45:24 46:17 48:22

requiring 20:19

respond 55:21

responded 24:18

responding 35:24

response 36:6

responses 7:1

restart 51:1

restraint 33:8

resuscitation 51:5,15

resuscitative 51:23

retired 53:18

retrieved 50:10

return 39:10

returned 22:15 23:22 32:12

returns 29:9

revealed 26:4

review 7:5 10:5 13:6 17:11 21:10 22:19 27:14 30:14 31:13 41:13

reviewed 8:21,23 9:14 21:1 27:13 30:5 37:20

reviewing 23:23 30:11 41:15

Revised 47:9

risk 32:20 42:5 43:10

Roberts 8:24 40:1

Roberts' 39:23

role 26:5

rolling 35:22

rolls 16:21, 22,23

_____

S

safety 34:1

sample 21:4

Santa 14:22 16:11

save 51:19

scan 13:8,12 15:8 36:18 49:10

scanned 13:2

scanner 10:23 11:1, 19 12:6,22

scanners 11:4,10,15, 22 12:1,11, 12

scanning 36:23

Scioto 9:21 10:2,7,21 12:22 13:13 15:7,20 17:8,12,13, 21 18:8,14 21:15 23:1 37:21 38:5 40:2,18 45:7 48:1

screaming 35:18,22

screen 19:18,21 20:2 21:11 25:2,7

search 10:20 13:17 14:3, 8,12,18 15:4,8,9,13, 17 16:5,12, 13 24:22 26:1,4,18 45:20,24 46:1,6,17 47:1,6,11, 12,13,14,18, 21,24 48:11, 13,15 49:5

searched 10:12 13:13, 18,21 14:23 15:1 27:22 33:17 34:5

searches 10:8 13:24 15:6 45:16

searching 10:15 28:15

secreted 11:24

secreting 49:11,16

security 34:2

selected
15:21
self-harm
34:17,24
send 38:15
sense 55:11,
14
sentence
21:20
sentenced
21:15
served 56:19
services
56:9
serving
21:20
set 23:24
setting 6:10
sex 14:6 48:4
shakedown
16:2,4,16
shakedowns
15:21 17:2
Shapero
56:3
share 25:2,5
Shawnee
32:15,19
39:2,6
sheriff's 9:22
10:3 15:20
23:1 39:18
shower 48:9
showering
48:12
showing
31:9 37:20
shows 28:8
51:5
side 56:22
signature
57:15
signed 46:1
signing
43:24
similarly
44:17
sincere 6:2
single 21:11
sit 46:5
situation
30:12
slide 26:24
27:18
smart 41:4
smuggled
53:2
smuggles
38:3
somebody's
48:20

someone's
36:24
Southern
23:7,14
24:14 31:11
speak 9:17
42:13,16
special 7:24
specific
54:24
squat 48:5
staff 13:16
14:21 15:1
17:7,14
20:15 22:3
23:13 32:9,
21 34:3
42:1,24 43:1
44:3,19,24
standards
17:23 18:1
Standby
25:5
start 30:8
started 49:22
stashed
35:4,10
stashes
53:17
state 5:3
stated 36:13
statement
34:15,16
statements
34:23 44:15
states 13:20
46:16 47:9
statute 46:16
Steele 13:1
38:3 45:6,11
49:16
Steele's 13:7
49:10
stipulate 5:9,
12
stipulation
5:4
straightforwa
rd 8:13
strike 17:17
20:22 22:18
37:24 42:13
51:13
strip 13:13,
17,21,24
14:3,18,23
15:1,4,9
47:21,24
48:10,13
stuffed 26:5
substance
7:19 26:24
27:18,24
28:3,4
suffered

31:17
suicidal
39:7,20
44:4,15
suicide
29:10,13
32:5,11,20
34:19 38:19,
23 42:5,22
43:9,16,17,
22 44:5
summon
49:21
summoned
49:24
supervision
23:1,3 41:10
suspect
33:21
swear 5:1
Sweeney
8:23
sworn 5:15
system 29:2

_____

T

Tackett
16:16,20
24:10,18
talk 35:15
45:15
talking 25:14
47:17
tape 26:9
27:24
technique
53:6
technology
11:11 36:23
telling 55:8
tells 39:6
term 16:1,8
testifies 5:15
testifying
55:3
testimony
7:7,9,11,16
10:6 40:16
things 24:5
37:4,6 55:10
thought
47:20
thoughts
42:10
tier 38:23
41:4 44:13
time 9:10
14:1 15:13
22:23 30:9
34:5 35:4
43:15 54:6,9
57:7
tissue 26:5

today 5:23
6:6 7:16
46:5
today's 9:13,
18
toilet 26:5
told 19:11
32:8
tool 11:1
12:6
top 38:9
tossing 16:7
totally 12:4
trained 11:17
transcribe
6:24
transcript
6:20 7:5,6
transported
24:13 36:3
treatment
23:6 51:10,
13
trial 6:12
45:13
true 17:12
truth 7:20
8:11
truthful 6:15
20:9
turn 26:19
29:4
turned 26:13
28:4
turning
18:12 28:21
two-tiered
40:18,24
typed 57:14
typically
48:5

_____

U

Uh-huh
35:20 37:13
ultimately
43:6
unable 36:14
undergo
41:18
underlying
18:20 19:12
underneath
11:7
understand
6:4,9,17,19
7:2,12 8:1,8,
10,16 12:1,
12 31:13
40:6,12,17
45:5,19
48:10,13
50:20 54:21
55:18

understandin
g 10:21 11:9
12:10,15
36:19 46:6
48:1
underwent
19:17
unit 16:13
unresponsiv
e 24:7
unusual 53:6
upper 40:20,
22

_____

V

valuables
30:22
Vasquez
5:14,20 57:4
versus 54:20
55:15
video 51:4,9,
14
violation
18:18,24
19:12
violence
19:8
virtually 6:7

_____

W

waived 57:15
wanted
30:14 31:15,
21 32:9
43:22
warden 15:3
40:6,11 49:7
warrant 46:1,
7,17 47:13
48:21 49:1,3
warrantless
47:11
warrants
49:5
watch 29:10,
14 32:5,11
34:19 38:19,
23 43:16,17,
22
watching
28:9
wave 11:5
weapons
10:13,16
12:7 37:8
week 36:11
57:8
weekly 15:21
weeks 41:19
When's 54:6
word 7:24
14:16

**words** 7:22

**work** 21:23
22:3,6,13,
15,21,23
37:3 54:17,
19,20 55:2,
14,15,16
56:14

**worked**
46:12 54:7,
10 56:2

**working** 14:1
29:1

**wrapped**
26:8

**write** 25:16
42:19

**wrong** 14:15

**wrote** 22:1,2
39:9

_____

**X**

**x-rays** 11:5

_____

**Y**

**year** 17:19
56:13

**years** 37:3
52:18 54:9

**Yosowitz**
5:8,18,22
31:4 57:4,7,
11

_____

**Z**

**Zoom** 5:24

_____

**§**

**§2933.32**
47:9