IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION, CINCINNATI, OHIO


- - -


JESSIE CANTRELL PERSONAL    :

REPRESENTATIVE AND          :

FIDUCIARY OF THE ESTATE     :

OF CORY CANTRELL,           :

Deceased,                   :

                            :

        Plaintiff,          :

                            :

        vs.                 :   Case No.

                            :   1:22-cv-00739

SCIOTO COUNTY,              :

OHIO/SCIOTO CO. BOARD OF    :

COMMISSIONERS, et al.,      :

:

Defendants.        :


- - -


VIDEOCONFERENCE DEPOSITION OF


DOMINIC HAYNESWORTH, M.D.


- - -


Tuesday, June 18, 2024


11:00 a.m.


- - -


ANN FORD

REGISTERED PROFESSIONAL REPORTER


- - -

```
 1    REMOTE APPEARANCES:

 2           BRIAN GREEN, Attorney at Law
             Shapero & Green, LLC
 3           Signature Square II, Suite 200
             25101 Chagrin Boulevard
 4           Beachwood, Ohio  44122
             (216) 831-5100
 5           bgreen@shaperolaw.com

 6                On behalf of the Plaintiff.

 7           ANDREW YOSOWITZ, Attorney at Law
             Teetor Westfall, LLC
 8           200 East Campus View Boulevard
             Suite 200
 9           Columbus, Ohio  43235
             (614) 412-4000
10           ayosowitz@teetorlaw.com

11                On behalf of the Defendants.

12                        - - -

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

1                          TUESDAY MORNING SESSION
                           June 18, 2024
2                          11:00 a.m.

3                            - - -

4                          STIPULATIONS

5                            - - -

6           It is stipulated by and between counsel

7    for the respective parties herein that this

8    deposition of DOMINIC HAYNESWORTH, M.D., a Witness

9    herein, called by the Defendants under the statute,

10   may be taken at this time and reduced to writing in

11   stenotypy by the Notary, whose notes may thereafter

12   be transcribed out of the presence of the witness;

13   and that proof of the official character and

14   qualifications of the Notary is waived.

15                            - - -

16

17

18

19

20

21

22

23

24

Page 5

1                          I N D E X

2   WITNESS                                    PAGE

3   DOMINIC HAYNESWORTH, M.D.
                     Examination                5
4                    (By MR. YOSOWITZ)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                   P R O C E E D I N G S

 2                         -  -  -

 3                 DOMINIC HAYNESWORTH, M.D.,

 4   being by me first remotely duly sworn, as hereinafter

 5   certified, testifies and says as follows:

 6                       EXAMINATION

 7   BY MR. YOSOWITZ:

 8   Q.        Good morning, Doctor.  We just met a few

 9   minutes ago.

10             Your name is Dominic Haynesworth; correct?

11   A.        Yes.

12   Q.        My name is Andrew Yosowitz.  We're here

13   today for your deposition.  This is my client's

14   pretrial opportunity to question you over Zoom about

15   an expert report that you prepared for this case.

16             I would ask that you give the same sincere

17   cooperation that you would give if a judge or jury

18   were listening.  Okay?

19   A.        Yes.

20   Q.        You're here today with attorney

21   Brian Green; correct?

22   A.        Yes.

23   Q.        Please understand that even though we're

24   in an informal setting, everything you say here is
```

just as important as if we were at trial in a courtroom with a judge and jury listening. Therefore, it's in your very best interest to give the most complete, accurate, and truthful answers you can to each and every one of my questions.

Do you understand that?

A. Understood.

Q. Please understand that the court reporter will produce a transcript of everything I say, everything you say, and everything Mr. Green says while we're on the record. For this reason, I need all of your answers to be out loud. The court reporter cannot transcribe nonverbal responses.

Do you understand that?

A. Understood.

Q. You'll have an opportunity to review your transcript and make changes to that transcript. However, if you do make changes to your testimony, I may ask the Court to allow me to reopen the deposition to question you about any changed testimony. I may also argue to a jury that it raises questions about your credibility.

Do you understand that?

A. Yes.

```
 1   Q.         Is there any reason why you can't give
 2   your most accurate testimony today?
 3   A.         None.
 4   Q.         In the last 48 hours, have you taken any
 5   medication that would impair your ability to tell the
 6   truth?
 7   A.         None.
 8   Q.         I'm going to give each of your words their
 9   most common meaning unless you tell me that a word
10   has a meaning that is special to you; is that fair?
11   A.         Yes.
12   Q.         Please be sure to allow me to complete the
13   entire question before you begin your answer;
14   otherwise, as you'll see, I'll repeat the entire
15   question from the beginning so that we can produce a
16   clean record.
17              Do you understand?
18   A.         Yes.
19   Q.         Do you understand that the oath you took
20   requires you to tell the whole truth, to give all the
21   information each question requests in a
22   straightforward manner, and, in so doing, use the
23   most candid and accurate language you possibly can?
24   A.         I do.
```

1  Q.        Do you have any questions for me before I

2  begin my questions?

3  A.        None.

4  Q.        Do you have a list of the materials that

5  you reviewed to assist you in preparing your expert

6  report dated April 23, 2024?

7  A.        Several from several different sources.  I

8  have a discovery by Allied Health and Chiropractic

9  about Mr. Cory Cantrell dated 6-18-2022.

10         I have from Mr. Marx several testimonies

11  by correctional officers.  And that's essentially it.

12  Q.        Okay.  What documents were in the

13  discovery provided to you by Allied Health?

14  A.        Essentially, the history of Mr. Cantrell

15  with his problems with his overdoses, needles broken

16  off in his arm, and the course of action that ensued

17  on the day of his overdose.

18  Q.        Did Allied Health summarize those

19  documents for you?

20  A.        Pretty much.

21  Q.        Okay.  So you relied on a summary prepared

22  by a company called Allied Health; is that right?

23  A.        Yes.

24  Q.        Do you know what person prepared that

1   summary?

2   A.        Yes.

3   Q.        Who was the person that prepared the

4   summary?

5   A.        Dr. Heidi -- I can get her last name for

6   you, but she is also an employee of Allied Health.

7   Let me get that name for you -- last name.

8   Q.        Sure.

9   A.        You can continue if you want.  I'll just

10  text over there.

11  Q.        Okay.  Are all the opinions that you

12  intend to offer in this case contained in your expert

13  report dated April 23, 2024?

14  A.        I think so.

15  Q.        Do you have any changes at this time to

16  make to your report?

17  A.        No.

18  Q.        What did you do to prepare for today's

19  deposition?

20  A.        Just read over the testimonies of the

21  correctional officers, main thing.  And I did reread

22  the report from Dr. Heidi at AHC.

23  Q.        Did you review -- at any point during your

24  preparation for this case, did you review any video?

Page 11

1    A.          No.

2    Q.          And which officers' testimonies did you

3    review?

4    A.          I reviewed Correctional Officer Boggs and

5    Ness.

6    Q.          And what compensation were you paid for

7    preparing this report?

8    A.          Nothing really.  Nothing yet -- as of yet.

9    Q.          What's the amount that you charge for

10   preparing this report?

11   A.          You know, I'm not sure what -- what --

12   what she charged for it.

13   Q.          Other than this case, have you provided

14   expert reports for the law firm of Shapero & Green?

15   A.          Prior to this?

16   Q.          Yes.

17   A.          No.

18   Q.          Are you currently board certified in

19   emergency medicine?

20   A.          No.  I'm no longer practicing emergency

21   medicine.  I was certified when I was practicing.

22               By the way, her last name is Williams.

23   Q.          Okay.  In the past year, how often did you

24   work at Huron Road Hospital?

Page 12

1   A.          Weekly.  Anywhere from three to four

2   shifts a week.

3   Q.          And since you stated you're no longer

4   practicing emergency medicine, what medicine did you

5   practice while you were at Huron Road Hospital?

6   A.          I practiced primarily personal injury with

7   AHC.  I am medical director at two other places, one

8   of them being an ambulance.  I'm the medical control

9   for that because they require an emergency physician.

10  And I'm medical director at Advanced Skin Renewal.

11  Q.          That broke up a little bit.

12  A.          Oh, I'm sorry.

13              (Stenographer clarification.)

14              MR. YOSOWITZ:  I'm going to ask him

15      some more specific questions about that.

16  BY MR. YOSOWITZ:

17  Q.          My question was, so when you're at Huron

18  Road Hospital, are you there practicing as part of

19  your personal injury company?

20  A.          No.

21  Q.          Okay.  What do you do when you're at Huron

22  Road Hospital?

23  A.          I do gunshots, stabbings, overdoses.

24  Medical emergencies in general.

Page 13

1   Q.          Okay.  So you work -- you currently --

2   when you work at Huron Road Hospital currently,

3   you're working in the ER?

4   A.          I'm no longer working at Huron Road

5   Hospital.  Huron Road has been closed for about

6   10 years.

7   Q.          Okay.  I thought on your resume it said

8   that you still work there.

9   A.          No.  I was -- they closed about 12 years

10  ago.  So I've been working at St. Vincent Charity --

11  Q.          Okay.

12  A.          -- downtown for the past 10 or 12 years.

13  Q.          All right.  Thank you.

14  A.          Sorry.

15  Q.          Do you still currently work at

16  Lutheran Hospital?

17  A.          No.

18  Q.          So the only hospital you work at currently

19  is St. Vincent Charity Medical Hospital?

20  A.          I am no longer doing emergency medicine,

21  period.

22  Q.          Okay.  But you still do work for

23  St. Vincent Charity Medical Center?

24  A.          St. Vincent is closed also.  I no longer

Page 14

1    do emergency medicine.

2    Q.        Okay.  You are not currently working at

3    any hospitals?

4    A.        No.

5    Q.        No?  That's not correct?

6    A.        I am no longer working at any other -- at

7    any hospital.

8    Q.        Okay.

9    A.        Okay.

10   Q.        All right.  What is Allied Health and

11   Chiropractic?

12   A.        Personal injury and chiropractic.

13   Q.        What do you do for them?

14   A.        Again, I am the -- I'm the collaborating

15   physician or medical director there.  I oversee

16   several NPs who are on staff who do most of the heavy

17   lifting over there.  I review all of the charts.  I

18   am there for any medical questions or problems that

19   they might have.

20   Q.        Do you personally see patients and treat

21   patients at Allied Health and Chiropractic?

22   A.        I see patients and with -- along with --

23   the nurse practitioners treat them, yes.

24   Q.        What is West Lake Injury Center Medical

Page 15

1    Care?

2    A.          That's just a branch of Allied Health.

3    Q.          What is TE Physical Medicine?

4    A.          I don't know.  TE Physical Medicine.  No.

5    That one, I don't know.

6    Q.          Your attorney provided me a CV, and on the

7    CV, there's an entry for medical director TE Physical

8    Medicine, LLC, for 2019 to current.

9                But you don't know what that is?

10   A.          No, I don't.

11   Q.          Okay.

12   A.          I don't know.  TE?

13   Q.          You've heard the term "respiratory arrest"

14   before; correct?

15   A.          Yes.

16   Q.          You've heard the term "cardiac arrest"

17   before; correct?

18   A.          Yes.

19   Q.          There's a medical difference between

20   respiratory arrest and cardiac arrest; correct?

21   A.          Absolutely.

22   Q.          Respiratory arrest is the cessation of

23   breathing; correct?

24   A.          Yes.

1    Q.        Cardiac arrest is the cessation of cardiac

2    mechanical activity confirmed by the absence of signs

3    of circulation; correct?

4    A.        That's correct.

5    Q.        When cardiac arrest occurs outside of a

6    hospital setting, it is called an out-of-hospital

7    cardiac arrest; correct?

8    A.        I've never heard that term.  But yes.

9    Q.        In this case, Cory Cantrell suffered an

10   out-of-hospital cardiac arrest on June 18, 2022;

11   correct?

12   A.        According to the record.

13   Q.        Based on your experience, would you agree

14   with me that survival rates for out-of-hospital

15   cardiac arrests are less than 10 percent?

16   A.        I didn't know that that was a statistic,

17   but there are so many factors at play here.  What was

18   the agent that caused the respiratory arrest, where

19   it happened, if the patient was alone.

20             I don't -- that statistic kind of doesn't

21   make any sense.  But ...

22   Q.        Well, do you believe that -- do you

23   believe that that statistic is incorrect?

24   A.        I don't have any -- where did it come

1    from?  I mean, I really don't have any reason not to

2    believe it.  I mean, if it's a noted source, and they

3    say that that's a statistic, I can't argue with it.

4    Q.        Have you ever heard of a medical journal

5    called Circulation?

6    A.        Yeah.

7    Q.        Would you agree with me that survival

8    rates for in-hospital cardiac arrests are less than

9    25 percent?

10   A.        Cardiac or respiratory?

11   Q.        Cardiac.

12   A.        All right.  Less than?

13   Q.        25 percent.

14   A.        Again, if you say that that's a statistic,

15   and it's from a relevant source, then I would agree

16   with it.

17   Q.        Would you agree with me that the most

18   important therapies for patients suffering from

19   nontraumatic cardiac arrest are prompt cardiac

20   defibrillation, shockable rhythms, and minimally

21   interrupted effective chest compressions?

22   A.        Yes.

23   Q.        Naloxone is an opioid antagonist; correct?

24   A.        Yes.

Page 18

1   Q.          It is sold under the brand name Narcan;

2   correct?

3   A.          Yes.

4   Q.          When corrections officers responded to

5   Cory Cantrell's fall on the evening of June 18,

6   2022, Mr. Cantrell was in cardiac arrest; correct?

7   A.          How do they know he was in cardiac arrest?

8   Q.          I'm asking you the questions.

9   A.          Okay.  Sorry.  That's what I read from the

10  report.  Yes.

11  Q.          No study has shown the benefit of Naloxone

12  administration in an out-of-hospital cardiac arrest;

13  correct?

14  A.          If -- I'm going to say yes on that.

15  Q.          Okay.  Tell me the study that you're aware

16  of that has shown that there's a benefit of Naloxone

17  administration for out-of-hospital cardiac arrest.

18  A.          I'm not saying that there was.  I'm not

19  saying that there was a study.

20  Q.          Are you aware of any study which has shown

21  a benefit of Naloxone administration for an

22  out-of-hospital cardiac arrest?

23  A.          No, I'm not aware.

24  Q.          Are you aware of any peer-reviewed

1    literature which has shown the benefit of Naloxone

2    administration for an out-of-hospital cardiac arrest?

3    A.        No, I'm not aware.

4    Q.        Would you agree that provision of CPR

5    should be the focus of initial care for an

6    out-of-hospital cardiac arrest?

7    A.        After administering Narcan and -- yes.

8    Q.        Would it surprise you to know that studies

9    analyzing Naloxone administration in out-of-hospital

10    cardiac arrest found that patients receiving Naloxone

11    had no difference in adjusted odds of return of

12    spontaneous circulation, survival to admission,

13    survival to discharge, and functional survival?

14    A.        I would not argue with that at all.

15    Q.        You are familiar with the Journal of

16    Emergency Medicine; correct?

17    A.        Yes.

18    Q.        The Journal of Emergency Medicine is the

19    official journal of the American Academy of Emergency

20    Medicine; correct?

21    A.        Yes.

22    Q.        The Journal of Emergency Medicine is an

23    authoritative journal in the field of emergency

24    medicine; correct?

Page 20

1   A.        Yes.

2   Q.        Did you read the Journal of Emergency

3   Medicine when you were practicing emergency medicine?

4   A.        Occasionally.

5   Q.        Would it surprise you that in a study

6   published two months ago in the Journal of Emergency

7   Medicine researchers found that out-of-hospital

8   cardiac arrest patients who receive Naloxone, despite

9   being younger and having fewer comorbidities, had

10  similar outcomes compared to those who received usual

11  care?

12  A.        That wouldn't surprise me at all.

13  Q.        Are you aware that the most recent

14  national model EMS clinical guidelines offered by the

15  National Association of State EMS Officials did not

16  recommend the administration of Naloxone as treatment

17  for cardiac arrest?

18  A.        Absolutely.

19  Q.        Are you aware of any EMS protocols that

20  recommend the administration of Naloxone as treatment

21  for cardiac arrest?

22  A.        Nope.  Never heard that that was an issue.

23  Q.        The paramedics that responded to the

24  Scioto County jail on June 18, 2022, to treat

Page 21

1    Mr. Cantrell did not administer Naloxone; correct?

2    A.        According to the record.

3    Q.        The paramedics administered epinephrine to

4    Mr. Cantrell; correct?

5    A.        I think they did.  I think I read that.

6    Yes.

7    Q.        In fact, they administered multiple rounds

8    of epinephrine; correct?

9    A.        Yes.

10   Q.        The emergency physicians at Southern Ohio

11   Medical Center did not administer Naloxone to

12   Mr. Cantrell; correct?

13   A.        I'm not sure if I read that.  But if

14   that's what the records said, okay.  Yes.

15   Q.        You reviewed the emergency department

16   records from Southern Ohio Medical Center; correct?

17   A.        I think I read the final -- the final

18   diagnosis from that.  Yes.

19   Q.        And the only drugs that the physicians at

20   Southern Ohio Medical Center administered to

21   Mr. Cantrell were epinephrine, calcium, and sodium

22   bicarb; correct?

23   A.        According to the record, yes.

24   Q.        And based on your experience, epinephrine,

Page 22

1    calcium, and sodium --

2              MR. YOSOWITZ:  We lost Mr. Green.

3        Stand by.

4              (Off the record.)

5    BY MR. YOSOWITZ:

6    Q.        So, Doctor, we were talking about

7    medications administered by the emergency room

8    physicians at Southern Ohio Medical Center.

9              Epinephrine, calcium, and sodium

10   bicarbonate, are those standard drugs to be given in

11   a cardiac arrest?

12   A.        In a cardiac arrest, yes.

13   Q.        You would agree with me that paramedics

14   and emergency room physicians undergo specialized

15   training on the treatment of cardiac arrest; correct?

16   A.        Absolutely.

17   Q.        And paramedics and emergency room

18   physicians have more medical training on cardiac

19   arrest than the corrections officers who attempted to

20   treat Mr. Cantrell on June 18, 2022; correct?

21   A.        That is true.

22   Q.        It's not your opinion that any paramedic

23   or physician who treated Mr. Cantrell on June 18,

24   2022, committed malpractice; correct?

Page 23

1  A.        None that I can see.

2  Q.        It's not your opinion that any paramedic

3  or physician who treated Mr. Cantrell on June 18,

4  2022, fell below the standard of care by failing to

5  administer Naloxone to Mr. Cantrell; correct?

6  A.        You said paramedic or physician?

7  Q.        Yes.

8  A.        Yes.  No.  None -- none that I can see.

9  No.

10  Q.        Okay.  You cannot state to a reasonable

11  degree of medical probability that Mr. Cantrell would

12  have survived his out-of-hospital cardiac arrest if

13  Naloxone had been administered by any first

14  responder -- paramedic or physician -- that treated

15  Mr. Cantrell on June 18, 2022; correct?

16          MR. GREEN:  Objection.

17          You can answer.

18          THE WITNESS:  Did you lose me?  So

19      you've been asking me about cardiac

20      arrest, and I don't know that -- I know

21      for a fact that Naloxone has absolutely no

22      effect on cardiac.

23          So, you know, we're talking about

24      almost apples and oranges here.

Page 24

1          Naloxone would have had no effect on

2      cardiac arrest.  But, you know, when they

3      got -- when the paramedics got there, got

4      him on the monitor or whatever, that

5      ascertains whether or not he's in cardiac

6      arrest.

7          He might appear to be pulseless.

8      But a lot of times, they have pulses, but

9      they're so miniscule that they really

10      can't sense them.  So until you get them

11      on a monitor, you really can't call that

12      arrhythmia.

13   BY MR. YOSOWITZ:

14   Q.       You're aware that in this case the

15   corrections officers applied an automated external

16   defibrillator to Mr. Cantrell; correct?

17   A.       Yes.  You do get a reading on that.  Yeah.

18   Q.       And the automated external defibrillator

19   did not recommend a shock; correct?

20   A.       Yeah.  Yes.

21   Q.       And so that means, at least according to

22   the automated external defibrillator, Mr. Cantrell

23   did not have a shockable rhythm; correct?

24   A.       Yes.

Page 25

1    Q.        Asystole is a nonshockable rhythm;

2    correct?

3    A.        Asystole is a nonshockable rhythm.

4    Q.        And would you consider someone who is in

5    asystole to be in cardiac arrest?

6    A.        Yes.

7    Q.        And, in fact, when the paramedics hooked

8    Mr. Cantrell up to their monitor, the rhythm that

9    they got was asystole; correct?

10   A.        Okay.  Yes.

11   Q.        Pulseless electrical activity -- if

12   someone was in pulseless electrical activity, would

13   you consider them in cardiac arrest?

14   A.        PEA is definitely cardiac arrest.

15   Q.        Is there any nonshockable rhythm that you

16   wouldn't consider cardiac arrest?

17   A.        No.

18   Q.        Back to my original question.  You can't

19   state to a reasonable degree of medical probability

20   that even if Naloxone had been provided to

21   Mr. Cantrell he would have survived his cardiac

22   arrest; correct?

23   A.        Yes.

24   Q.        You can state that he would have survived?

Page 26

1  A.        Oh, I'm sorry.  The way it was phrased.

2            No.  No.  Absolutely not.

3  Q.        Okay.  When the officers and paramedics

4  were working on Mr. Cantrell, he had a large volume

5  of pink frothy substance coming out of his nose and

6  mouth; correct?

7  A.        Yes.

8  Q.        Okay.  Based on your training and

9  experience, the pink frothy substance coming out of

10 Mr. Cantrell's nose was probably fluid from pulmonary

11 edema; correct?

12 A.        Or he might have aspirated.

13 Q.        What does that mean, to aspirate?

14 A.        Aspiration means that you basically

15 regurgitate stomach contents without any protection

16 of the airway.

17 Q.        And based on your training and experience,

18 how long does a person have to be in cardiac arrest

19 before either fluid from pulmonary edema or aspirate

20 stuff begins flowing out of a person's nose and

21 mouth?

22 A.        Say after cardiac arrest, probably within

23 a minute or so.

24 Q.        In order for intranasal Naloxone to work,

Page 27

1    it has to come in contact with the nasal mucosa;

2    correct?

3    A.          That is correct.

4    Q.          Okay.  Wouldn't a large volume of fluid or

5    aspirate emanating from a person's nose hinder the

6    absorption of Naloxone?

7    A.          A large amount, yes.

8    Q.          And, in fact, when the paramedics arrived,

9    they had to suction his nose and mouth; correct?

10   A.          Yes.

11   Q.          They were also unable to intubate him;

12   correct?

13   A.          Oh, really?  Okay.  I missed that part.  I

14   wasn't sure about that.  Okay.

15   Q.          And they had to continue suction at the

16   emergency room; correct?

17   A.          So they had -- they had -- yeah.  Yes.

18              MR. YOSOWITZ:  Okay.  Doctor, that's

19        all the questions I have for you.  I thank

20        you for your time this morning.

21              Like I said, please send Brian or

22        Jim your invoice for the time for this

23        deposition, along with a W-9, and we'll

24        get you paid.

Page 28

1          THE WITNESS:  Okay.  Mr. Yosowitz,

2      nice to meet you.

3          THE STENOGRAPHER:  If there are no

4      other questions, do you want to read or

5      waive?

6          MR. GREEN:  He'll read it.

7          THE STENOGRAPHER:  Okay.  Do you

8      want me to transcribe?

9          MR. YOSOWITZ:  Absolutely.

10          THE STENOGRAPHER:  And do you want a

11      copy, Brian?

12          MR. GREEN:  Yes.

13          THE STENOGRAPHER:  Is there any

14      expedite or regular service?

15          MR. YOSOWITZ:  No.  Regular service

16      is fine and an e-tran, please.

17              (Signature not waived.)

18                  - - -

19          And, thereupon, the videoconference

20      deposition was concluded at approximately

21      11:35 a.m.

22                  - - -

23

24

Page 29

1                    DEPOSITION ERRATA SHEET

2

3

4    Jessie Cantrell, Personal Representative and Fiduciary

5          of the Estate of Cory Cantrell, Deceased,

6

7          vs. Scioto County, Ohio/Scioto Co. Board of

8                       Commissioners

9

10               DECLARATION UNDER PENALTY OF PERJURY

11        I declare under penalty of perjury that I have

12    read the entire transcript of my Deposition taken in

13    the captioned matter or the same has been read to me,

14    and the same is true and accurate, save and except

15    for changes and/or corrections, if any, as indicated

16    by me on the DEPOSITION ERRATA SHEET hereof, with the

17    understanding that I offer these changes as if still

18    under oath.

19          Signed on the _____ day of

20    _____, 20 _____.

21

22

     _____
23   DOMINIC HAYNESWORTH, M.D.

24

Page 30

1                    DEPOSITION ERRATA SHEET

2     Page No._____Line No._____Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____Line No._____Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____Line No._____Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23
      SIGNATURE_____DATE:_____
24             DOMINIC HAYNESWORTH, M.D.

```
 1                       CERTIFICATE
     State of Ohio      :
 2                      SS:
     County of Knox     :
 3              I, Ann Ford, Notary Public in and for the

 4    State of Ohio, duly commissioned and qualified,

 5    certify that the within named witness was by me duly

 6    sworn to testify to the whole truth in the cause

 7    aforesaid; that the testimony was taken down by me in

 8    stenotypy in the presence of said witness, afterwards

 9    transcribed upon a computer; that the foregoing is a

10    true and correct transcript of the testimony given by

11    said witness taken at the time and place in the

12    foregoing caption specified.

13              I certify that I am not a relative,

14    employee, or attorney of any of the parties hereto,

15    or of any attorney or counsel employed by the

16    parties, or financially interested in the action.

17              IN WITNESS WHEREOF, I have set my hand and

18    affixed my seal of office at Mount Vernon, Ohio, on

19    this 25th day of June, 2024.

20

21    _____
              ANN FORD, Notary Public
22            in and for the State of Ohio
              and Registered Professional
23            Reporter

24    My Commission expires:  April 18, 2026.
```