### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**JESSIE CANTRELL,**

**Plaintiff,**

**Case No. 1:22-cv-739**

**v.**

**JUDGE DOUGLAS R. COLE**

**SCIOTO COUNTY, OHIO, et al.,**

**Defendants.**

### OPINION AND ORDER

In 2022, opioid-related overdose deaths reached a peak in the United States.[1] That overdose epidemic played out not only on the nation's streets, but also in its jails and prisons. This case concerns one such tragedy. On June 18, 2022, while incarcerated at the Scioto County Jail, Cory Cantrell fatally overdosed after another inmate smuggled fentanyl into the facility.[2] Jessie Cantrell, Cory's half-sister, serves as personal representative and fiduciary of Cory's estate. In that role, she sued the Scioto County Board of Commissioners along with its three members in their official capacities,[3] Scioto County Sheriff David Thoroughman (in both his individual and official capacity),[4] Scioto County Jail administrator Captain Damon Roberts (in both

---

[1] *See Drug Overdose Deaths: Facts and Figures: U.S. Overdose Deaths Involving Any Opioid by Sex, 1999–2023*, Nat'l Inst. on Drug Abuse, https://perma.cc/F7CJ-WZCG (indicating 81,806 opioid-related overdose deaths in 2022).

[2] Since both Jessie and Cory share the same last name, the Court refers to them by their first names.

[3] Scottie Powell, Byran Davis, and Cathy Coleman. (Doc. 48, #124–25).

[4] Jessie also sued two other members of the Sheriff's Office—Ron Davis and Blaine Duduit, (Doc. 48, #125)—but, on Jessie's motion, (Doc. 57), the Court dismissed them from the case without prejudice over a year ago, (6/25/24 Not. Order).

his individual and official capacity), and five corrections officers who work at the Scioto County Jail (in both their individual and official capacities).[5] (Am. Compl., Doc. 48, #125–30; Roberts Decl., Doc. 64-7, #300). Jessie claims that Defendants were deliberately indifferent in failing to prevent Cory's overdose, thereby violating his Eighth and Fourteenth Amendment rights. (Doc. 48, #138–40). She also asserts two related Ohio state-law claims. (*Id.* at #141). Defendants now move for summary judgment on each of those claims. It turns out a key issue in resolving that motion is procedural—what evidence can the Court properly consider? On the record here, that ends up being a close call. Ultimately, though, for the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 65).

## BACKGROUND[6]

**A.     In January 2022, Cory Cantrell Is Booked into the Scioto County Jail; He Suffers Several Overdoses after He Is Sentenced to a Period of Confinement for a Probation Violation.**

The sequence of events leading to Cory Cantrell's death began when he was booked into the Scioto County Jail for violating the terms of his probation in January

---

[5] Those five corrections officers are Christopher Boggs, Rebecca Davila, Casie Marcum, Devyn McNeil, and shift supervisor Sergeant Kenneth Aldridge. (Doc. 48, #126, 130). These individuals were added to the case when Jessie filed her Amended Complaint on April 26, 2024. (*See id.*). Initially, she named John and Jane Doe entities. (Compl., Doc. 1, #3, 5–6).

[6] In recounting the case's factual background on a motion for summary judgment, the Court relies on the parties' stipulated undisputed facts, submitted as part of their briefing as directed by Standing Order I.F.2, available at https://perma.cc/S2YS-S7ZP. (*See* Docs. 65-1, 79-1). The parties have mostly complied with this Court's Standing Orders. But the Court does need to address Jessie's evasively worded efforts to avoid admitting certain of Defendant's proposed undisputed facts. (*See, e.g.*, Doc. 79-1, #2349 ("Admitted that Defendants *contend this is standard practice* at the jail." (emphasis added))). These

2022. (Doc. 64-7, #306; Pl.'s. Resp. to Proposed Undisputed Facts, Doc. 79-1, #2349). On March 24, 2022, the Scioto County Court of Common Pleas sentenced Cory to ten months of confinement in the Jail, with 153 days credit for time served. (Doc. 64-1, #272). Presumably that means he was set for release sometime in August 2022.

Cory's time in the Jail started off relatively well, but eventually became marred by drug abuse and close calls. (*See* Doc. 64-7, #306–07). Most of the turmoil occurred in April 2022, over the span of a few days. First, on April 7, 2022, while Cory was out on work release (that is, outside of the Jail), he overdosed on opioids and was taken to the hospital. (*Id.* at #307; Roberts Dep., Doc. 76, #2149). He survived and returned to the Jail after the hospital released him. (Doc. 64-7, #307). But two days later, corrections officers found Cory unresponsive in the middle of the night—he had overdosed again, this time in the Jail.[7] (*Id.* at #307–08, 662 (incident report)). Corrections officers administered three doses of Narcan nasal spray,[8] saving Cory's life. (*Id.*). After that, the Jail placed Cory on suicide watch, which meant that he was

---

"admissions" are largely unhelpful for the Court—they suggest Jessie does not admit such proposed facts. That said, under the Court's Standing Orders, she must either admit or deny proposed facts, and "[i]f denied, the denial must be supported with a citation to contrary evidence that would be admissible at trial." Standing Order I.F.2.b. Accordingly, where Jessie has used ambiguously phrased "admissions," but without citations to contrary record evidence, the Court treats these as fully admitted facts. The same goes for denials where Jessie chose not to cite to contrary record evidence. (*See, e.g.*, Doc. 79-1, #2349 ("Denied insofar as defendants contend there is proof that these steps were actually taken vis-à-vis Perry Steele.")).

[7] Cory was being held in Holding Cell #5 at this time because he went through the Jail's booking protocol after his return from the hospital. (*See* Doc. 64-7, #307).

[8] Narcan is the well-known brand name for naloxone. That medication is used to reverse or reduce the effects of an opioid overdose. (Doc. 65, #1121 n.2).

placed in the booking area and corrections officers were required to conduct personal observation checks on him every ten minutes. (*Id.* at #308; Doc. 76, #2113).

One day later, however, on April 10, the Jail removed Cory from suicide watch after the Jail's mental-health provider met with him and determined that suicide watch was unnecessary. (Doc. 64-7, #308–09). With the benefit of hindsight, one might question that decision—Cory overdosed for a third time in the early morning hours on April 11. (*Id.* at #309, 666 (incident report)). Corrections officers responded to sounds of Cory screaming; again, they administered Narcan and, again, Cory survived. (*Id.*). On this last occasion, Cory told medical staff at the hospital that he had gotten heroin from another inmate that day, and also that he had marijuana taped in his rectum. (Cantrell Med. Rs. Doc. 64-12, #919). The medical staff removed the drugs from Cory's body cavity, but no one analyzed the drugs to determine their contents. (Doc. 64-7, #309–10). After that day, Cory did not overdose again until the day he died. (*Id.*).

But overdosing wasn't Cory's only source of medical difficulties. On April 15, 2022, Cory climbed over the railing of the second floor of the Jail, hung by his hands off the edge, and fell to the ground.[9] (*Id.* at #310, 667 (incident report)). This required another hospital visit. (*Id.*). While Cory reported that this was not a suicide attempt, after he received treatment at the hospital the Jail placed him on suicide watch again

---

[9] Jessie says that Cory "threw himself … from a two-story cell block." (Doc. 79, #2330). Nowhere in the record does it say that. Rather, the record makes clear that Cory hung down from the railing and dropped to the ground. (Doc. 64-7, #310, 667). While the Court must view the facts in the light most favorable to Jessie here, this assertion is "blatantly contradicted by the record," so the Court rejects her interpretation. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

4

anyway. (*Id.* at #310, 667, 736). But it appears the Jail took him off suicide watch later that day after Cory received another mental-health assessment. (*Id.* at #716 (suicidal inmate security checklist for April 15, 2022), 726–30 (mental-health-assessment report)).

Despite Jail personnel removing him from suicide watch, Captain Roberts decided to keep Cory in the booking area—in Holding Cell #5 to be exact.[10] (*Id.* at 310; Doc. 76, #2111–12). Captain Roberts felt Cory couldn't "stay in other housing units without having issues."[11] (Doc. 76, #2111–12). That was because the layout of the booking area made it easier for corrections officers to monitor higher-need inmates, like Cory. To start, the area contains only six cells. (*Id.* at #2114). Plus, each cell has clear glass windows through which the officers can observe inmates. (*Id.* at #2131). And, as long at the inmates are not lying down, officers seated at the booking desk can see inmates in each cell through those windows. (*Id.* at #2131). When corrections officers conduct personal observation checks, though, they must come up to the window to observe the entire holding cell (i.e., even those inmates lying down). (*Id.* at #2113, 2131). The parties dispute whether corrections officers working the

---

[10] Jessie claims that "[t]he only reason inmates are housed in the booking area for any significant length of time is for 'medical observation or suicide watch.'" (Doc. 79, #2331 (quoting Boggs Dep., Doc. 72, #1767–68)). But as Defendants aptly point out, those are just the two reasons Corrections Officer Boggs thought of during his deposition, not an exhaustive list of reasons. (*See* Doc. 72, #1767–68; Reply, Doc. 82, #2405). Captain Roberts explicitly states why Cory was kept in the booking are for a longer period of time. (Doc. 64-7, #310–11; Doc. 76, #2111–12).

[11] Cory briefly went back on suicide watch on June 10, 2022, after he made some concerning statements. (Doc. 64-7, #311, 717, 731–35) But, shortly thereafter, he was taken off after another mental-health assessment. (*Id.*).

booking area were required to conduct personal observation checks every twenty minutes, or rather every sixty minutes.[12] (Doc. 79-1, #2357; Doc. 82, #2406). Either way, inmates in the booking area were more closely monitored than those in the other areas of the Jail (or at least they were supposed to be).

But the booking area also comes with a downside—inmates housed there are consistently exposed to new arrivals to the Jail. And some of those new arrivals smuggle contraband.

## B. The Jail Takes Several Measures to Prevent Contraband from Entering Its Premises.

Scioto County Jail takes several steps to prevent contraband such as illegal narcotics from entering its premises. Corrections officers search inmates upon entry into and exit from the Jail's security perimeter in three ways. First, before allowing an inmate into the Jail's interior, corrections officers remove the inmate's outer clothing (e.g., coats, hats) and "frisk search" the inmate for weapons or contraband. (Doc. 64-7, #302, 318, 331). Next, the officers put the inmate through an x-ray scanner.[13] (*Id.* at #302, 341–42). Two corrections officers review the resulting body

---

[12] The Jail's staffing policy, dated September 21, 2022, required booking officers to conduct checks "no less than every 20 minutes." (Jail Staffing Policy, Doc. 76-1, #2291, 2311, 2314–15). Sheriff Thoroughman and Captain Roberts say this was an oversight and that it was meant to read sixty minutes, as required by Ohio law. (Thoroughman Dep., Doc. 69, #1381–91; Doc. 76, #2210–12). *See also* Ohio Admin. Code § 5120:1-8-03(B)(7). While it is true Ohio law requires checks only every sixty minutes, and it is likely that the twenty-minute policy was a scrivener's error, viewed in the light most favorable to Jessie, the Jail was in violation of its own policy to conduct checks every twenty minutes in the booking area. (*See* Doc. 76, #2211 ("That very well may be how they wrote it when it was originally written[, but w]e've never had 20-minute checks.")).

[13] There are exceptions, but none are relevant (e.g., pregnant women). (Doc. 64-7, #302; Doc. 65-1, #1131)

scan. (*Id.* at #303). If either officer sees something suspicious, they call over a supervisor to review the scan. (*Id.*). And if the officers identify contraband inside a body cavity (e.g., rectum), the inmate is asked to remove the contraband. (*Id.*). If the inmate refuses, he or she is isolated. (*Id.*). Finally, officers strip-search the inmate in connection with the inmate changing into a jail uniform. (*Id.* at #303, 335). During that process, the inmate must squat and cough—a method meant to expel any contraband that is hidden in the body cavity. (*Id.* at #303). If the inmate leaves the security perimeter of the Jail, they must undergo the same searches. (*Id.* at #303, 342, 353).

The Jail also takes additional measures after the intake process to ensure narcotics are not maintained within its facilities if they somehow make it in through the screening process. Corrections officers conduct weekly shakedowns of the housing- and booking-area cells to discover and remove any contraband. (*Id.* at #304). If an officer finds contraband, all inmates are removed and searched, and, in some instances, the Jail supplies new mats and bedrolls in case there is any further hidden contraband. (*See id.*). Further, in an effort to deter would-be smugglers, the Jail has a history of referring for prosecution those who bring contraband into the Jail. (*Id.* at #304, 372–556 (referrals); *see also* Conkel Dep., Doc. 67, #1178). Given all of these measures, even Jessie's expert, a correctional-facilities consultant, agrees that the

Jail takes reasonable measures to prevent contraband from entering its premises.[14] (Vasquez Dep., Doc. 61, #187, 222–26).

The Ohio Department of Rehabilitation and Correction largely agrees with that assessment. A few months after the events in this case took place, that Department conducted its annual review of the Jail's compliance with the Ohio Administrative Code. (*See* Doc. 64-7, #313–15). The Department's review found that the Jail complied with every contraband, medical, and mental-health standard required by the administrative code.[15] (*See id.*).

## C. On June 18, 2022, Perry Steele Smuggles Fentanyl into the Jail and Sells Some to Cory.

Unfortunately, that the Jail uses reasonable screening processes doesn't mean that the processes are perfect. At least on some occasions, those seeking to get contraband into the Jail seem to find a way. Body scanners, for example, sometimes have shortcomings. Even with good images, scanners can struggle "to pick up pills and powders because [they] lack density." (Doc. 61, #181). Worse yet, some inmates may have developed methods to potentially "beat" the scanner. (*See* Aldridge Dep., Doc. 73, #1836). Take Perry Steele for example. It's unclear what method he used, or

---

[14] Jessie resists this finding. (Doc. 65-1, #1134; Doc. 79-1, #2351). But the deposition testimony is clear. Question: "[Y]ou would agree … that the Scioto County Jail has reasonable policies and practices to prevent the introduction of contraband into the jail, correct?" Answer: "Yes." (Doc. 61, #187).

[15] Jessie claims that "[t]he inspection letter does not mention review related to contraband standards," but the letter itself does not bear that out. (Doc. 79-1, #2351). For example, the letter cites Ohio Administrative Code §§ 5120:1-8-03(B)(2), (11), 5120:1-8-06(B), (C), & 5120:1-8-07(G)—all of which concern contraband-control procedures. (Doc. 64-7, #313). *See e.g.,* Ohio Admin. Code §§ 5120:1-8-03(B)(2) ("(Important) All inmates shall be searched whenever entering or leaving the jail's security perimeter to control contraband.").

if the technology of the scanner is just not up to snuff, but when Steele entered the Jail around 5:00 p.m. on June 18, 2022, he succeeded in smuggling in narcotics. (Doc. 64-7, #311, 737 (booking record)).

Officer Andy Ness booked Steele that evening.[16] (*See id.* at #737). While Ness does not remember all aspects of Steele's booking (which is perhaps not surprising, as Ness has done many bookings), Ness stated that he conducted all the normal intake search procedures, including a strip search. (Ness Dep., Doc. 75, #1979–85, 1992; *see also* Doc. 64-7, #311, ("Mr. Steele would have been searched and scanned just like any other inmate."); Boggs Dep., Doc. 72, #1762 (Officer Boggs recalling Steele's intake body scan)).[17] Despite these measures, Steele succeeded in bringing fentanyl into the Jail. (Doc. 67, #1168–69, 1208). Specifically, he brought the narcotics into Holding Cell #5 in the booking area—the cell that also housed Cory, along with

---

[16] Ness is not a party to this lawsuit, but he worked the same shift as Corrections Officer Boggs and was there when Cory overdosed. (Doc. 75, #2015–16).

[17] Jessie contends there was no strip search because there was no documentation showing that it occurred. (Doc. 65-1, #1134; Doc. 79-1, #2352). But her supposedly "contrary" record citation indicates why. While Jail policy requires officers to document non-intake strip searches, the Jail does not document intake strip searches. (Doc. 76, #2258–59). Additionally, Jessie contends that Steele's body scan lacked quality, "was useless," and laments that the officers did not re-scan him. (Doc. 79, #2332; Doc. 79-1, #2352). That, too, lacks a basis in fact. If Steele's body scan consisted solely of the low-quality PDF image provided by the parties, (*see* Doc. 64-7, #747), the Court may have sympathized with Jessie's position. But the problem for her is that that single image is not an accurate representation of what the corrections officers were viewing. As Captain Roberts explains, "body scanner images are meant to be stored on the body scanner and viewed using the scanner's software." (Roberts Supp. Decl., Doc. 81-2, #2374; *see also* Doc. 75, #1991 (Corrections Officer Ness describing how the scanner can create "different views of the same scan")). There are thousands of possible images and filters the scanner can produce. (Doc. 81-2, #2375; *see id.* at #2377–92 (various versions of Steele's body scan)). Jessie apparently passed up the opportunity to view the higher quality versions of the images at the Jail. (Yosowitz Decl., Doc. 81-1, #2365–66). But based on the many other images provided to the Court, the Court finds the scans to be of a good quality. (*See* Doc. 81-2, #2377–92).

cellmates Gary Watson, Devin Kritzwiser, and Jerrid Franklin. (Doc. 64-7, #311; Doc. 67, #1161; Ness Dep. Doc. 75, #1998; Doc. 76, #2128).

Steele was in Holding Cell #5 for under two hours. He bonded out at 6:27 p.m. (Doc. 64-7, #312; Doc. 75, #1997–98). But during that short time, he sold fentanyl to Cory. (*See* Doc. 67, #1208; *see also* Def.'s Proposed Undisputed Facts, Doc. 65-1, #1135; Doc. 79-1, #2352). Cory took those drugs and within hours, he was dead. (*See* Doc. 67, #1208; Doc. 65-1, #1135; Doc. 79-1, #2352).

## D. Cory Fatally Overdoses a Few Hours after Steele Is Released.

The parties dispute what happened in the hours leading up to Cory's death. One aspect that is clear is that Officer Christopher Boggs and Officer Ness were working the booking area on the evening shift from 3:00–11:00 p.m. (Boggs Decl., Doc. 64-3, #276; Doc. 72, #1750). For most of their shift, like clockwork, they logged personal observation checks every thirty minutes. (Shift Log Report, Doc. 75-1, #2064–65). But Jessie disputes whether those checks actually occurred. (Doc. 79, #2333–34). Rather, she suggests that the rigidly entered time entries suggest that Boggs and Ness were simply entering checks into the system at predetermined intervals. (*Id.* at #2334). Indeed, Boggs and Ness were the only two officers to have such rigid, every-thirty-minutes-on-the-dot, check entries logged in the forty-eight-hour log period that the Jail provided. (*See generally* Doc. 75-1). Moreover, two of Cory's cellmates, Gary Watson and Devin Kritzwiser, both told a detective that

10

officers were not conducting regular checks that evening. (Watson Interview Video at 14:33; Kritzwiser Interview Video at 6:00, 7:20).[18]

Boggs maintains that he and Ness completed the checks. (Doc. 64-3, #277). Moreover, he claims that he did not notice any problems with Cory. (*Id.*). Although he did admit that at a certain point in time the lights were off in Holding Cell #5 (because it was nighttime) and that when an inmate is lying down "it is difficult to distinguish normal sleeping versus unconsciousness." (*Id.*). But, again, Jessie tells a different story. She points to video interviews of Cory's cellmates, which were recorded shortly after his death. According to Cory's cellmate, Gary Watson, after Cory snorted the fentanyl he procured from Steele, Cory began to "act up" by hitting cellmates and falling down. (Watson Interview Video at 11:35–12:15). Watson says this caught Boggs's attention—"Boggs came in there … and asked him … 'Cantrell are you okay?'" (*Id.* at 12:16–45; *see also* Kritzwiser Interview Video at 6:08–24 ("But the officer did notice that he was fucked up … he said something like 'Hey, what's wrong with you?' … I can't remember who it was though."). (*But see* Doc. 72, #1773 (Boggs claiming that he "wouldn't have said something like that")). But then apparently Cory became nearly catatonic, with his cellmates trying to care for him by rubbing his chest and putting a cold wash rag on him while "he kept turning blue." (Watson Interview Video at 13:15–14:30; *see also* Kritzwiser Interview Video at 5:30–50).

---

[18] The Court explains why it considers this video testimony, although unsworn, at this stage in Part A.1. Both video interviews were physically submitted to the Court.

Fast-forward a few hours (but just a few). In the back half of Boggs's and Ness's shift, something changes in their personal observation check entries. To start, they log a check at 8:55 p.m. (which is distinct from their previous thirty-minute-on-the-dot entries before that time). (Doc. 75-1, #2065). Then, after that, there is a long gap—sixty-six minutes to be exact—before they log their next check at 10:01 p.m. (*See id.*). That second observation check entry is interesting for two reasons. First, it evinces a violation of the Jail's policy (and the Ohio Administrative Code) that checks occur every sixty minutes.[19] (Doc. 76, #2113). Second, according to Boggs, "[a]t approximately 10:02 p.m., the inmates in Holding Cell #5 began beating on the door to their cell." (Doc. 64-3, #276). Cory was in dire need of medical attention.[20]

The Jail shared the video footage of the holding area starting at 10:00 p.m. exactly. (1/8/25 Not. Order). At the start of the video, Officer Casie Marcum is seated "at the booking desk writing a report or completing shift logs." (Marcum Decl., Doc. 64-5, #296; Booking Video, 22:00:01). Watching the first few minutes of the video, it becomes apparent that no corrections officer performs a personal observation check at 10:01 p.m. (Booking Video, 22:00:01–22:02:00). Simply put, the personal observation check Boggs or Ness logged at 10:01 p.m. did not occur in the video.

---

[19] Not to mention, also in violation of the twenty-minute requirement for the booking area—which all corrections officers at the Jail apparently violated. *See supra* note 12.

[20] Even more far-fetched than Officer Boggs' assertion that he or Ness conducted 10:01 p.m. check (which is contradicted by video evidence—see below) is his purported belief that Cory could have gone "from being perfectly fine to having no pulse, being unresponsive and having copious amounts of fluid coming out of his nose" within one minute. (Doc. 72, #1760 (stating "[y]eah, it could happen"). Jessie's medical expert says that "is a physiological impossibility." (Doc. 78-1, #2319). In other words, the record is sufficient for a jury to conclude that Boggs' story is implausible.

Instead, immediately *before* 10:01 p.m., Marcum abruptly gets out of the chair and rushes to Holding Cell #5's door along with Officer Devyn McNeil—the inmates had begun pounding on the door. (Doc. 64-5, #296; McNeil Decl., Doc. 64-6, #298–99; Booking Video, 22:00:59–22:01:20). Officer Boggs and another officer (likely Ness) closely follow. (Booking Video, 22:00:59–22:01:20). After seeing Cantrell "laying on the floor" with "fluid coming out of his nose" and pale skin, Marcum runs to get supervisor Sergeant Kenneth Aldridge. (Doc. 64-5, #296). Simultaneously, Boggs, who had worked as a paramedic before his employment at the Jail, checks Cory for a pulse.[21] (Doc. 64-3, #276–77). He finds none.[22] Cory is "not breathing … [i]s blue … [and] ha[s] copious amounts of what looked like vomit and snot coming out of his nose and mouth." (*Id.*).[23] Boggs then retrieves an automated external defibrillator (AED). (*Id.* at #277). At the same time, Marcum returns with Sergeant Aldridge. (Booking Video, 22:01:40–22:01:50).

---

[21] Although this happened inside of Holding Cell #5, so the video does not show it.

[22] Officer Aldridge also "couldn't find a pulse." (Doc. 73, #1813, 1843)

[23] While Jessie attempts to deny that Cory was emitting copious amounts of fluids, the record overwhelmingly supports Defendants' version of the facts. (Doc. 79-1, #2354–55). She argues there were no fluids because the investigator found none after arriving at the scene and because two of the officers did not include details about the fluids in their reports. (*Id.*). The problem is that every officer testifies in one place or another that Cory had tons of fluids coming out of his body. (*See, e.g.*, Doc. 64-2, #274 ("Mr. Cantrell had a lot of fluid coming out of his nose and mouth. Every time I would do a chest compression, more fluid gushed out. We rolled Mr. Cantrell onto his side to try to drain some of the fluid."). Some officers *did* include this detail in their reports. (*See, e.g.*, Doc. 64-7, #668 (Officer McNeil describing the "bodily fluids coming from [Cory's] mouth and nostrils"); Watson Interview Video at 16:15–30 (detailing fluids coming out of Cory's mouth and nose)). Further, the video of the aftermath shows an officer wiping off the ground with what looks like a large towel. (*See* Booking Video, 22:25:00–22:25:30).

Several events then happen in quick succession or simultaneously: the officers pull Cory out of his cell and into the booking area; someone calls the paramedics; Officer Rebecca Davila enters the scene; Aldridge, Davila, Boggs, McNeil, and Marcum take turns performing CPR on Cory; Marcum and Ness run to retrieve bottled oxygen; Boggs applies the AED to Cory, although it advised against a shock; Aldridge calls Captain Roberts to tell him about the situation, then calls dispatch to try to expedite the paramedics' response. (Booking Video, 22:01:55–22:02:50; Doc. 64-2, #273–74; Doc. 64-3, #277; Doc. 64-4, #293; Doc. 64-5, #296; Doc. 64-6, #299). All of this for eight or so frantic minutes until the paramedics arrive. (Booking Video, 22:01:55–22:09:40). And at no point do the officers stop administering care—"there was always someone doing CPR on [Cory] or using the AED to analyze [him]." (Doc. 64-5, #296). Ultimately, though, Cory did not survive.

But there was one action the officers did not take. They did not administer Narcan to Cory, even though they had it on hand.[24] (Davila Dep., Doc. 68, #1288–89). In fact, it appears that Officer Marcum[25] retrieved Narcan when he went to notify Sergeant Aldridge, although he never administered it. (Aldridge Decl., Doc. 64-2, #273). Each officer provides their own reason for why they did not administer Narcan, although it basically boils down to this: it was hectic, and they were trying other methods to save him. (*Id.* at #274 ("I cannot say exactly why we did not administer

---

[24] While Narcan can be administered intravenously / intramuscularly and intranasally, the Jail kept only nasal Narcan. (Doc. 68, #1291–92).

[25] There appears to be some confusion on the docket regarding Casie Marcum's gender. The Complaint used female pronouns, but it appears that was incorrect. Because Officer Marcum was referred to as Mr. Marcum in his deposition, the Court assumes he is male. (Doc. 74, #1853).

Narcan. I just recall that everyone, including myself, was focused on doing CPR, getting the AED and other equipment we might be able to use."); Boggs Decl., Doc. 64-3, #277 ("Based on my training and experience as a paramedic, the use of Narcan is not indicated if the patient has no pulse, if they are asystole … or if there is any kind of blockage [e.g., the nasal mucus] that would prevent the administration of the medication."); Davila Decl., Doc. 64-4, #294 ("I did not administer Narcan to [Cory] … I was focused on doing or assisting with CPR and getting [his] heart started again. For another, I did not believe that nasal Narcan would be effective when [he] was not breathing and had no heartbeat."); Marcum Decl., Doc. 64-5, #296 ("I did not really think about administering Narcan because I was focused first on getting my supervisor, then getting oxygen and then performing CPR.")).

After the paramedics arrived, they did not administer Narcan either. (Haynesworth Dep., Doc. 62, #255–56). Rather, they gave Cory epinephrine, calcium, and sodium bicarbonate, which are typically used to treat cardiac arrest. (*Id.* at #255–57; Paramedic Rs., Doc. 81-3).

As Jessie's medical expert admits, there is no guarantee Cory would have survived even if the officers had administered Narcan. (Doc. 62, #260–61). Further, that expert also agrees that "a large volume of fluid or aspirate emanating from a person's nose" would "hinder" Narcan's effectiveness. (*Id.* at #261–62). (*But see* Doc. Haynesworth Decl., 78-1, #2319 (Plaintiff's expert stating "that does not change [his] opinion that Narcan most certainly should have been administered and could well have saved his life")).

15

But, even if Cory had fluids coming out of his nose, and even if he was in cardiac arrest, Jessie believes the officers should have administered Narcan. (Doc. 79, #2340–44; Doc. 79-1, #2355, 2358). And in any event, Jessie also contends that Cory was not in cardiac arrest and that Officer Boggs was wrong that Cory lacked a pulse at the time the officers pulled him out of Holding Cell #5. (Doc. 79, #2343; Doc. 78-1, #2319 ("It is highly likely that [Cory had] a pulse when corrections officers removed him from his cell.")). In short, she believes that more effective or more prompt medical treatment could have saved Cory's life.

Before moving on, the Court needs to account for the officers besides Boggs who are Defendants based on their activities in the time before 10:00 p.m. First, there is Officer Marcum, who said he was working as a floor officer and was not assigned to the booking area (although as mentioned, he was using the computer in the booking area at 10:00 p.m.). (Doc. 64-5, #295). He further stated that he had no contact with Cory on June 18, 2022, until Cory became unresponsive. (*Id.*). Next is Officer Davila. She was also assigned to the floor, but was not in the booking area immediately prior to responding to the emergency and did not interact with Cory until she started performing CPR on him. (Doc. 64-4, #293). Then there is Officer McNeil. While it is unclear what work he was assigned to that day, he was in the booking area when the inmates in Holding Cell #5 began pounding in their door. (Doc. 64-6, #298). He doesn't recall interacting with Cory at all prior to finding him unconscious in the holding cell. (*Id.*). Turn next to shift-supervisor Sergeant Aldridge. Before June 18, 2022, Sergeant Aldridge had only a single interaction that he can recall with Cory. It occurred on

April 9, 2022, when officers discovered and confiscated drugs in a holding cell Cory was in. (Aldridge Decl., Doc. 64-2, #274–75). From Aldridge's perspective "everything appeared to be normal during the second shift on June 18, 2022," before Cory's overdose. (*Id.* at #273). He was in the sergeant's office when he heard commotion and was walking out of the office when Officer Marcum came to retrieve him. (*Id.*).

### E. Law Enforcement Investigates Steele, and Steele is Convicted.

After the paramedics transported Cory to the hospital, Detective Sergeant Jodi Conkel arrived on the scene at the Jail. (Doc. 67, #1157–58). She and Detective John Cart investigated Perry Steele's involvement with Cory's death. (*Id.* at #1157). Conkel immediately called the Jail and told the officers to separate the inmates in Holding Cell #5 to prevent them from aligning on a single story. (*Id.* at #1158–59). Once she arrived, Conkel interviewed Cory's cellmates. As a result of that investigation, along with information obtained from Cory's father, law enforcement arrested Steele the next day. (*Id.* at #1161, 1183–84, 1187–88; Doc. 64-7, #312). A Scioto County grand jury later indicted Steele for involuntary manslaughter, drug trafficking, and possession of drugs. (Doc. 64-7, #312). A jury found him guilty on only the latter two charges. (*Id.*).

Jessie criticizes several aspects of the investigation: (1) that Detective Conkel (or any other detective) never formally interviewed or documented what any corrections officers said about the incident, (*see* Doc. 67, #1201)[26]; (2) that Sheriff

---

[26] Although Conkel did not record interviews with the corrections officers, (*see* Doc. 67, #1201), she did speak with them—she specifically remembers questioning Officer Boggs, (*see id.* at #1160, 1198–99). So the record contradicts Jessie's claims that "none of the

Thoroughman did not conduct a formal internal investigation into the Jail's handling of Cory's overdose, (*see* Doc. 69, #1365); and (3) that the Jail did not preserve video footage of the hours preceding Cory's death, (*see* Doc. 76, #2114–15).[27] (Doc. 79, #2336–37, 2345).

## F.  A Few Months After Cory's Death, Jessie Cantrell Initiates this Deliberate Indifference Lawsuit.

Dissatisfied with the Jail's investigative efforts and convinced (1) that the corrections officers failed to properly monitor or treat Cory, and (2) that their failures resulted in his death, Jessie initiated this lawsuit on December 12, 2022. (Doc. 1). About a year and a half later, after conducting some discovery and with leave of the Court, Jessie filed an Amended Complaint. (Doc. 45).

In the operative complaint, Jessie claims that Defendants violated Cory's rights under the Eighth Amendment's Cruel and Unusual Punishments Clause, as incorporated against the states by the Fourteenth Amendment's Due Process Clause. (Doc. 48, #138–40). Presently, she advances two theories, both grounded in the idea that Defendants were deliberately indifferent to Cory's medical needs in violation of 42 U.S.C. § 1983. First, she argues that there is a genuine dispute of material fact concerning both (1) Defendants' knowledge of Cory's condition, and (2) their alleged failure to provide medical treatment to Cory, in the hours before they eventually

---

officers … were *ever* interviewed as part of the so-called investigation." (Doc. 79, #2345 (emphasis in original)).

[27] Jessie claims that Conkel reviewed the video footage of the time preceding Cory's death. (Doc. 79, #2336). But all Conkel tells Kritzwiser is that she expects that they'll be able to have the footage. (Kritzwiser Interview Video at 6:38).

administered care. (Doc. 79, #2337–40). Second, Jessie argues that, once they started treating Cory, Defendants' failure to administer Narcan amounted to deliberate indifference. (*Id.* at #2340–44). Beyond that, Jessie says that Scioto County ratified these actions when the Sheriff's Office failed to conduct any meaningful internal investigation into Cory's death, which means that the County is liable under § 1983 as well.[28] (*Id.* at #2344–46). Finally, Jessie also seeks to hold Defendants liable under state law: (1) she asserts a wrongful death claim against all Defendants under Ohio Revised Code § 2125.01, et seq.; and (2) she asserts that Sheriff Thoroughman is responsible for the alleged misconduct of his deputies under Ohio Revised Code § 311.05. (Doc. 48, #141).

Defendants now move for summary judgment on all of these claims. (Doc. 65). Jessie responded, (Doc. 79), and Defendants replied, (Doc. 82), so the matter is ripe for the Court's review.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that (1) there is no genuine dispute as to any material fact, and (2) they are entitled to judgment as a matter of law, as to one or more claims or issues. Fed. R. Civ. P. 56(a). The first part of the summary-judgment standard focuses on the factual record: the movant bears the burden of pointing to specific evidence in the record to show the absence of a genuine dispute of material fact (or, if it is an issue on which the non-movant bears

---

[28] Jessie originally pleaded that the Jail had insufficient policies and customs in place to keep contraband out of the Jail and to prevent fatal overdoses, (*see* Doc. 48, #135–40), but it appears she has abandoned those claims, (*see* Doc. 79, #2344–46; Doc. 82, #2413).

the burden at trial, the lack of any evidence that would allow the non-movant to meet that burden). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The second part of the standard requires the movant to show that the facts (or lack of facts) identified at the first step entitles the movant to judgment as a matter of law. *See id.* at 323.

In measuring the movant's arguments against that standard, "the Court must view the evidence in the light most favorable to the non-moving party." *Saint Vil v. Blue Ash Healthcare, LLC*, No. 1:23-cv-85, 2024 WL 3373312, at *3 (S.D. Ohio July 9, 2024) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). But if the movant carries its burden, then summary judgment is appropriate unless the nonmovant can "present some sufficient disagreement" through citations to facts in the record "that would warrant submitting the dispute to a jury." *Id.* (cleaned up). That said, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

So here, because the non-movant (Cantrell) bears the burden of proving her claims at trial, the movants (Defendants) can prevail by showing that Cantrell lacks evidence to support an essential element of each claim on which they seek summary judgment. Still, the non-movants can take their case to a jury if they can point to evidence in the record sufficient to create a genuine dispute about whether they can support their claims. If the facts, viewed in the light most favorable to the non-

movants, evince such a dispute, the Court must forward the dispute to a factfinder. But if not, the movant is entitled to summary judgment.

It also bears noting that this Court does not have the responsibility to sua sponte search the record for evidence creating a genuine issue of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). That burden instead falls upon the nonmoving party to "set forth specific facts" or evidence in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted).

## LAW AND ANALYSIS

Obtaining (or avoiding) summary judgment turns on the parties' ability to show the lack (or the presence) of a genuine dispute of material fact. But in deciding that question, the Court first must resolve any disputes regarding the scope of the material that the Court can consider in assessing whether that standard is met. Here, the parties raise two disputes as to the material the Court may properly consider. So the Court first addresses those two issues before reaching the substance of Defendant's arguments on the merits.

**A.    Initial Evidentiary Matters.**

**1.    The Court Does Not Consider Detective Conkel's Report, which Contains Inadmissible Hearsay; the Court Does, however, Consider the Video Interviews of Cory's Cellmates.**

Defendants object to Jessie's reliance on Detective Conkel's investigative report into Cory's death. (Doc. 82, #2403–05 (citing Doc. 79, #2334, 2336); *see also* Conkel Investigative Report, Doc. 75-2). They argue that the Court cannot consider

21

the statements that Jessie quotes from Conkel's report because those statements are inadmissible hearsay. (Doc. 82, #2403–05). The report, which Conkel drafted on June 19, 2022, contains quotations that the report attributes to Cory's cellmates (Watson and Kritzwiser) from their interviews with Conkel. (Doc. 75-2, #2071–72).

Federal Rule of Civil Procedure 56(c) allows a party opposing a motion for summary judgment to cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in asserting that there are genuine disputes of fact at play. Once that party does so, however, the other party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). And after that, the burden shifts to "the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.* (advisory committee notes). As this language suggests, while "[t]he proffered evidence need not be in admissible *form*, [] its *content* must be admissible." *Tranter v. Orick*, 460 F. App'x 513, 515 (6th Cir. 2012) (quoting *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)); *see also Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 423 (6th Cir. 2021) (explaining that Rule 56 "requires a plaintiff's evidence to be admissible only as to its contents and not as to its form, *as long as the plaintiff can proffer that it will be produced in an admissible form*" (emphasis added)). So putting that all together, "a party opposing summary judgment who proffers evidence in a form not admissible at trial 'must show that she can make good on the promise of the

pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary.'" *Bard v. Brown Cnty*, 970 F.3d 738, 757 n.12 (6th Cir. 2020) (quotation omitted).

Here, Jessie has put forth certain contents from Conkel's investigative report, a "document" that is in the record. Defendants then objected that her proffered evidence is inadmissible. But from Jessie, there's only crickets as to whether the Court can consider Conkel's report.[29] And, as Defendants point out, in similar circumstances in *Tranter v. Orick*, the Sixth Circuit found that a plaintiff forfeited the argument that a police department investigation report could be admissible at trial by failing to argue for a specific hearsay exception in the district court. 460 F. App'x at 515. Moreover, because the report was "simply a compilation of witness statements, all of which [we]re hearsay," the *Tranter* Court found that the report made "no factual findings" and could not qualify for the hearsay exception for public records. *Id.* (citing the former Fed. R. Evid. 803(8)(C)[30]).

Unfortunately for Defendants, the Sixth Circuit has muddied the water a bit on this topic. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 430–31 (6th Cir. 2021) (Cook, J., dissenting). Notwithstanding *Tranter*, a later panel observed, in a reported case (unlike *Tranter*), that "courts, in determining whether to consider hearsay evidence, may inquire as to whether the party opposing summary judgment is capable

---

[29] Jessie could have, and likely should have, moved for leave to file a surreply on this issue.

[30] See Federal Rule of Evidence 803(8)(A)(iii) for the current version.

of producing an otherwise inadmissible hearsay statement in a form that will be admissible at trial, i.e., via substituted oral testimony by the third-party declarant." *Id.* at 424 n.8 (emphasis omitted). That is, the Sixth Circuit seems to suggest that a party can overcome the hearsay objection by arguing that the asserted declarant can him- or herself appear and testify at trial. *But see Purdy v. Newland*, 39 F.3d 1182, 1994 WL 601341, at *1 n.1 (6th Cir. Nov. 2, 1994) (Table) (explaining that Rule 56 required statements from a private investigator's unsworn interviews "to be sworn" to be considered at summary judgment).

Against that backdrop, the investigative report involves three levels of potential hearsay problems. First, it is an unsworn document.[31] Second, it contains Detective Conkel's recitations of Cory's cellmates' interview responses (i.e., Detective Conkel's out-of-court statement in the report about what the cellmates said). (*See* Doc. 75-2, #2071–72). Third, it contains what the cellmates said Officer Boggs said to Cory. (*Id.* at 2071 ("He stated at one point … Boggs came over and said Corey [sic] are you fucked up? Because you are acting like you are.")).

Taking those in reverse order, Boggs's purported statements strike the Court as non-hearsay, as Jessie would not offer it for the truth of the matter asserted, but rather for Boggs's state of mind (i.e., that he was on notice that Cory was using drugs). That said, the cellmates' statements about what Boggs allegedly said are hearsay, as

---

[31] Here there may be an argument that a hearsay exception applies to Conkel's report—perhaps it is a business record under Federal Rule of Evidence 803(6), or a public record under Rule 803(8). *See Tranter*, 460 F. App'x 513, 515 (6th Cir. 2012); *Fortson v. Henness*, No. 1:22-cv-410, 2024 WL 3512747, at *10, (S.D. Ohio Feb. 23, 2024). But Jessie did not argue either. So the Court considers the argument as to either forfeited at this stage.

Jessie would offer them for the truth of the cellmates' statements—that Boggs did in fact say this to Cory. And then Conkel's recitations of the cellmates' recitations are hearsay, as well. In short, there is a double hearsay problem with the investigative report.[32]

Given the Sixth Circuit's guidance, the Court asks whether Jessie would be capable of admitting this report at trial through "substituted oral testimony by *the* third-party declarant." *Wyatt*, 999 F.3d at 424 n.8. The Court finds that Jessie could not. Here, "the" third-party declarant in the report is Detective Conkel. And even if Detective Conkel took the stand to lay the foundation for the report (and if a hearsay exception applied to the report), there would still be a hearsay issue for the statements Jessie relies on in her response—namely Detective Conkel would be testifying as to what Cory's cellmates said Boggs said. This is classic hearsay. To avoid that, Jessie would need to put one of the cellmates (either Watson or Kritzwiser) on the stand to testify on the same.

Jessie perhaps could have argued that her potential ability to put two third-party declarants on the stand to solve the double-hearsay problem should allow courts to consider documents with such problems for summary-judgment purposes. But two problems. First, she didn't make that argument, so she forfeited it. Second, the Court finds that the argument would stretch the Sixth Circuit's (admittedly somewhat amorphous) standard too far. Indeed, adopting that approach would likely hobble

---

[32] And the same problem presents itself with Conkel's deposition testimony where she is reviewing her investigative report. (*See, e.g.*, Doc. 67, #1175). The Court disregards this testimony for the same reasons it disregards the report.

Rule 56(c)(2), as courts would find themselves imagining innumerable potential witnesses that a proponent of a document *could* put on the stand to render a statement in that document admissible. It's a classic slippery slope. So, the Court does not consider Conkel's investigative report.

Separately, though, Jessie also submitted the videos of Conkel's interviews with Watson and Kritzwiser. To these, Defendants offered no objection. (*See* Doc. 82, #2403–05). And to the extent Defendants are arguing that the Court should not consider these videos because "Plaintiff could have … deposed" Watson and Kritzwiser, (Doc. 82, #2404 n.1), the Supreme Court has noted that "Rule 56 does not require the nonmoving party to depose her own witnesses … [but, instead,] permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c)." *Celotex*, 477 U.S. at 324. Granted, Jessie did not submit any affidavits or declarations from Watson or Kritzwiser either, nor does the testimony the two offer in the videos appear to be sworn. Providing sworn testimony in one form or another would be preferred. Indeed, *Celotex*'s reference to "evidentiary materials" could be understood as an oblique reference to a requirement for sworn testimony of one kind or another. But Federal Rule of Civil Procedure 56 was also amended in 2010 to broaden the Court's ability to consider on summary judgment material that is not presented in admissible form. In particular, the party relying on the evidence merely must explain the admissible form in which it would be presented. Here, the material in the videos is, of course, inadmissible in its current form. But the "admissible form" seems straightforward—either third-party declarant who

26

appears in the videos (Watson or Kritzwiser) could substitute their own oral testimony to that same effect at trial. *See Wyatt*, 999 F.3d at 424 n.8. Accordingly, both because Defendants did not specifically object to the videos' potential admissibility, and because Jessie could put either Watson or Kritzwiser on the stand at trial to testify to the events they described in the video, the Court considers the video interviews.[33]

But merely because the Court elects to consider the video interviews does not mean that the Court will consider any proposed facts that Jessie submitted based on the investigative report that go beyond the accounts in the videos. Notably, for example, she claims as a proposed disputed fact that Cory was "screaming" or "shouting" after he used the fentanyl. (Doc. 79, #2334, 2338, 2340; Doc. 79-1, #2357). Jessie bases this proposed fact on Conkel's report where she writes that, during his interview, "Gary Watson … stated that Cory was very messed up screaming and trying to hit all of them and that he was falling down hitting his head and he had bumps on his head." (Doc. 75-2, #2071). But, perhaps illustrating the problem hearsay presents, at no point in Watson's video interview (nor Kritzwiser's for the matter) does Cory's cellmate say that Cory was yelling, screaming, shouting, or the like. (*See* Watson Interview Video at 7:30–17:50). Watson does assert that Cory was acting up by hitting his cellmates and falling down. (*See generally id.*). But both his and Kritzwiser's interviews give the impression that for most of the time Cory was high,

---

[33] This finding also comports with federal courts' preference for deciding cases on their merits. *See Foman v. Davis*, 371 U.S. 178, 181–82 (1962) (explaining that avoiding merits decisions based on "mere technicalities" would be "entirely contrary to the spirit of the Federal Rules of Civil Procedure").

he was just out of it, suggesting that he was not loud at all. (*See generally id.*; Kritzwiser Interview Video at 2:40–8:27). Accordingly, the Court does not consider that proposed disputed fact.

### 2. The Court Does Not Impose an Adverse Inference Regarding the Unpreserved Video Footage for the Time-Period Preceding Cory's Death.

The Jail did not preserve the video footage of the hours leading up to Cory's death. (Doc. 76, #2114–15). Understandably, this frustrates Jessie. She claims that the "footage would have definitively proved or disproved the supposed 10:01 p.m. check and also could have provided strong evidence that the COs were alerted to Cory's overdose earlier in the evening." (Doc. 79, #2340). She further states that because the Jail did not preserve the footage it's unlikely that its contents were favorable to Defendants. (*Id.*). In fact, Jessie claims that a "contrary inference is compelled at this juncture." (*Id.*).

To the extent Jessie attempts to make a legal argument (without citation to any legal authority), her argument fails.

No doubt, there is a legal basis for the "contrary inference" to which Jessie alludes—an adverse inference based on spoliated evidence. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Oro Cap. Advisors, LLC v. Borror Constr. Co., LLC*, No. 2:19-cv-4907, 2022 WL 4310925, at *4 (S.D. Ohio Sept. 19, 2022) (quotation omitted). As for the potential adverse inference, that's well within the Court's inherent power to adopt when a party makes

the appropriate showing. *See Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (explaining that federal courts have "broad discretion to craft proper sanctions for spoliated evidence"). And the Sixth Circuit is also clear on what that necessary showing is:

> A party seeking a spoliation sanction because evidence was destroyed must establish '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1071 (6th Cir. 2014) (quoting *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010)).

Unfortunately, Jessie does not identify or engage with this standard. As a result, the Court has no way of knowing (or even really guessing) whether Defendants conduct satisfies this standard.[34] Accordingly, the Court declines Jessie's undeveloped argument inviting this Court to impose an adverse inference as a result of Defendants' non-retention of the video footage for the time preceding Cory's death.[35]

---

[34] Additionally, it appears that the Jail's video retention policy is to keep footage for three months unless there is an incident. (Doc. 69, #1370). The Jail maintained the footage starting at 10:00 p.m. But given that Jessie initiated this lawsuit nearly six months after June 18, 2022, (*see* Doc. 1), the Jail may not have had reason to hold onto the footage before 10:00 p.m. past its normal retention timeframe.

[35] Several district courts—including courts within this circuit—have said that digital video footage is electronically stored information (ESI). *See, e.g.*, *Chatman v. TruGreen Ltd. P'ship*, No. 22-cv-2705, 2023 WL 8284401, at *2 (W.D. Tenn. Nov. 30, 2023); *Black v. Costco Wholesale Corp.*, 542 F. Supp. 3d 750, 752 (M.D. Tenn. 2021); *Wooden v. Barringer*, No. 3:16-cv-446, 2017 WL 5140518, at *3–4 (N.D. Fla. Nov. 6, 2017). Federal Rule of Civil Procedure 37(e) lays out a specific sanctions regime for ESI spoliation. Under that regime, a district

**B.      Plaintiff's Deliberate Indifference Claim Survives Summary Judgment Only as to Defendant Boggs.**

With the evidentiary issues out of the way, the Court turns to the merits. On that front, Jessie argues that the individual Defendants were deliberately indifferent to Cory's medical needs in two ways: (1) that Officers Boggs, Marcum, and McNeil knew that Cory was overdosing in the hours before 10:01 p.m. and chose to ignore it; and (2) that all five corrections officers failed to administer Narcan. (Doc. 79, #2337–44). Defendants argue that no constitutional violation occurred, and that even if one did, the individual Defendants are entitled to qualified immunity. (Doc. 65, #1119–24). Ultimately, the Court agrees with Defendants for the most part—especially on Jessie's Narcan theory, which is deficient as a matter of law. But, as to the failure to administer care in the hours before 10:01 p.m., the Court finds that there is a genuine dispute of material fact as to whether Defendant Boggs knew Cory was suffering from an overdose and then deliberately ignored Cory's medical needs (largely as a result of the cellmates' video statements). As a result, Jessie's deliberate indifference claim against Boggs survives summary judgment.

**1.      There Is a Genuine Dispute of Material Fact as to whether Defendant Boggs Should Have Administered Care in the Hours Preceding Cory's Death.**

The Jail "has a constitutional obligation to provide medical care to those whom it detains." *Burwell v. City of Lansing*, 7 F.4th 456, 462 (6th Cir. 2021) (quoting

---

court may impose an adverse inference only if it finds that the party who failed to preserve the ESI "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Jessie has not put forth facts that support such a finding. So to the extent that the unpreserved footage constitutes ESI, the Court may not impose an adverse inference here.

*Griffith v. Franklin Cnty.*, 975 F.3d 554, 566 (6th Cir. 2020)). That's because when a state prison or jail affirmatively exercises its power to restrain "an individual's liberty [so] that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety"—it violates the Eighth and Fourteenth Amendments. *Griffith*, 975 F.3d at 566 (emphasis omitted) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)); *see Robinson v. California*, 370 U.S. 660, 666 (1962). When officials act in such a way—"by *omission*"—they "display 'deliberate indifference' to a sufficiently serious risk of harm from which they owe an inmate protection." *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 683 (6th Cir. 2024). In sum, "[t]he Eighth Amendment's prohibition on cruel and unusual punishment [] provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs." *Griffith*, 975 F.3d at 566 (quotation omitted).

"A prisoner's deliberate[-]indifference claim … has objective and subjective components." *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 315 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 692 (2024). "The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Constitution." *Griffith*, 975 F.3d at 567 (cleaned up). As for the subjective component, a plaintiff must show that each "defendant 'knew of and disregarded an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn and that a substantial risk of serious harm exists, and he must also draw the inference.'" *Helphenstine*, 60 F.4th at 315 (cleaned up) (quoting

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).[36] In other words, "[t]o violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

The Court addresses each component in turn.

### a. Objective Component.

Jessie easily satisfies the objective component. Defendants don't dispute this finding. (Doc. 65, #1120). Nor could they. The Sixth Circuit has "routinely held that a condition resulting in death is 'sufficiently serious' to meet the objective component." *Burwell*, 7 F.4th at 463 (citing *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018)); *see also Alzid v. Porter*, No. 23-2098, 2024 WL 4579427, at *4 (6th Cir. Oct. 25, 2024) (finding an objective serious medical need when a prisoner

---

[36] Jessie cites the incorrect standard for the subjective component. (*See* Doc. 79, #2338). She cites *Brawner v. Scott County* for the proposition that the subjective component is satisfied when a plaintiff shows an officer's "action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [an inmate's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [the inmate], even though a reasonable official in [that officer's] position would have known that the serious medical need posed an excessive risk to [the inmate's] health or safety." 14 F.4th 585, 597 (6th Cir. 2021). The problem is that the standard on which Jessie relies is the standard for pre-trial detainees, not prisoners. As the *Helphenstine* Court noted, *Brawner* "modified the subjective prong" by "lower[ing] the subjective component from actual knowledge to recklessness" for pre-trial detainees in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). 60 F.4th at 315–16. Here, Cory was sentenced to ten months of confinement in the Jail, so he was not a pre-trial detainee, and the heightened standard from *Farmer* (outlined above) applies. (Doc. 64-1, #272).

That said, the Court still cites to pre-*Brawner* cases involving pre-trial detainees since the standards for prisoners and pre-trial detainees were the same before the Sixth Circuit decided *Brawner*. Additionally, since the pre-trial-detainee standard is now *less* stringent post-*Brawner*, wherever a plaintiff in one of those cases falls short on their deliberate indifference claims, they also fall short under the higher prisoner standard.

died from the acute toxicity associated with ethanol and heroin consumption). In *Burwell*, a drug overdose resulting in an inmate's death satisfied the objective prong. 7 F.4th at 464. Similar to that case, here "video evidence shows [Cory] in clear medical distress." *Id*. Cory had "copious amounts" of fluid emanating from his nose and mouth and his skin was discolored. (Doc. 64-3, #276–77). *See also supra* note 23. "Anyone who observed [Cory] in that condition would have understood his critical need for medical attention." *Burwell*, 7 F.4th at 465. So Jessie meets the objective component.

### b. Subjective Component.

As for the subjective component, Jessie argues that Officers Boggs, Marcum, and McNeil were deliberately indifferent for ignoring Cory's overdose "for more than an hour." (Doc. 79, #2337–38). Stated differently, they should have administered care sooner.[37] And further, Jessie claims that these officers *knew* that Cory needed medical assistance.

As mentioned, to satisfy the subjective prong, "a prisoner must point to evidence that 'the official knows of and disregards an excessive risk to inmate health or safety.'" *Alzid*, 2024 WL 4579427, at *4 (quoting *Farmer*, 511 U.S. at 837). Officers Boggs, Marcum, and McNeil must have "failed to act with a mental state 'equivalent

---

[37] Jessie does not argue that Officer Davila or Sergeant Aldridge exhibited deliberate indifference for failure to administer care in the hours before 10:01 p.m. (See Doc. 79, #2337–40). Nor could she. Officer Davila had no interaction with Cory prior to administering CPR on him. (Doc. 64-4, #293). The same goes for Officer Aldridge, who had limited interactions with Cory in the preceding months and no interaction with him on June 18, 2022, before 10:01 p.m. (Doc. 64-2, #273–75). In other words, Jessie's only basis for asserting that Davila and Aldridge are culpable is on her second theory related to the officers' failure to administer Narcan.

to criminal recklessness.'" *Id.* (quoting *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). That means each officer must have been *aware* that Cory was in need of medical attention and disregarded Cory's need.[38] *See Farmer*, 511 U.S. at 836–37. In contrast, "'[a]n official's failure to alleviate a significant risk that he should have perceived but did not' is insufficient to be condemned as a constitutional violation." *Meirs v. Ottawa Cnty.*, 821 F. App'x 445, 451 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 838). So Jessie has a high bar to meet to hold Defendants liable—one that requires "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

With that high bar in mind, though, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842. For example, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* If the need was obvious, and the official did nothing, "he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* at 843 n.8.

---

[38] The officers did not need to know that Cory was overdosing, but only that he was having a medical crisis. *See Burwell*, 7 F.4th at 473–75 (explaining that "there is no rule requiring knowledge that a detainee ingested drugs to establish an officer's deliberate indifference" but only that the officer "witnesse[s] a detainee in obvious distress"). In other words, "it does not matter whether [the officers] knew that [Cory] was suffering from an overdose specifically as opposed to some other serious medical condition. There is no requirement that an officer correctly diagnose the cause of a detainee's obvious distress." *Id.* at 475.

None of the officer Defendants have stated that they knew Cory was in need of medical care in the hours before 10:01 p.m. So Jessie must point to contrary evidence indicating otherwise. She posits three reasons that a genuine dispute of material fact exists as to whether Officers Boggs, Marcum, and McNeil knew that Cory needed medical attention in the hours preceding his death: (1) at some point, Cory was screaming in the booking area, and, since Boggs, Marcum, and McNeil were in the booking area, they would have heard his screams and known that he was in need; (2) Officer Boggs, at some point, entered Holding Cell #5, observed Cory's condition, and even inquired as to whether Cory was okay; and (3) the officers knew of Cory's proclivity for overdosing and that he was housed in the booking area because he needed monitoring. (Doc. 79, #2338–39). She says that the "yawning gap" between Bogg's logged 8:55 p.m. check and the 10:01 p.m. logged check "is no mere coincidence." (*Id.* at #2339). Rather, "[i]t is strong circumstantial evidence that the [officers] were deliberately ignoring Cory." (*Id.*).

As alluded to, the Court "must address the subjective component for each officer individually … and 'information available to one defendant may not be automatically imputed to the others.'" *Burwell*, 7 F.4th at 466 (quoting *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014)). The Court starts with Jessie's proposed evidence concerning Officer Boggs.

### i.   Boggs.

The Court agrees with Jessie that a genuine dispute of material fact exists as to whether Officer Boggs knew about Cory's condition before 10:01 p.m. If Officer

Boggs is to be believed, after Perry Steele bonded out at 6:27 p.m., (Doc. 64-7, #311), he or Officer Ness conducted personal observation checks at 6:30, 7:00, 7:30, 8:00, 8:30, and 8:55 p.m., (Doc. 75-1, #2064–65; *see also* Doc. 72, #1754–56). According to Cory's cellmates, Cory was either acting up—falling down and hitting cellmates—or nearly catatonic during that nearly-three-and-a-half-hour period. (*See* Watson Interview Video at 13:15–14:30; *see also* Kritzwiser Interview Video at 5:30–50). Further, according to Cory's cellmates, Boggs conducted at least one check, during which he asked Cory whether he was "fucked up" and if he was okay. (Watson Interview Video at 12:18–45; Kritzwiser Interview at 6:08–24). Boggs denies this interaction occurred. (Doc. 72, #1773). But that's a credibility determination for the finder of fact.

The Court finds that a reasonable jury faced with the anticipated testimony from Watson or Kritzwiser could conclude that Boggs observed Cory in a distressed state and knew that he needed medical attention. Further, the Court finds that a reasonable jury could further conclude that Officer Boggs ignored that need when he proceeded to fail to check Holding Cell #5 for over an hour before 10:01 p.m. (*See* Doc. 75-1, #2065). It is undisputed that in the hour before Cory's death, Boggs did not check on Cory. In failing to do so, not only did Boggs violate the Jail's policy to conduct checks at least once every hour, he violated the Ohio Administrative Code. (*See* Doc. 76, #2113). Ohio Admin. Code § 5120:1-8-03(B)(7). There is nothing in the record the Court is aware of that explains this odd (and frankly suspicious) gap. (*See* Doc. 72, #1757–60).

Defendants argue that failing to perform checks does not amount to deliberate indifference. (Doc. 82, #2407). True, "failing to follow internal policies," like conducting checks "without more, does not constitute deliberate indifference." *Burwell*, 7 F.4th at 471. But here, the Court finds there is *more*. Record evidence established that Boggs observed Cory at least once and asked him if something was wrong with him during that observation.

Defendants also resist this conclusion by pointing out several other aspects of the cellmates' video testimony. First, that Cory responded to Boggs's inquiry into his well-being, by saying he was okay. (Doc. 82, #2408 (citing Waston Interview Video 12:15–30; Kritzwiser Interview Video at 6:10–18; 6:42–50)). But to the Court, Cory's self-assessment to Boggs matters little. To offer an obvious example: if an officer discovered an inmate with blood gushing from their wrists (in a suicide attempt) and asked whether the inmate was okay, to which the inmate responded in the affirmative, that would not relieve the officer of their duty to act. The question is whether Cory's condition was obvious enough and whether Boggs observed that obvious condition. And that's a question for the jury.

They also argue that the cellmate interviews establish that they were trying to cover up Cory's distress. (Doc. 82, #2410). That, of course, is belied by the portions of the interviews where they state that the officer knew Cory was in distress. Finally, Defendants state that whether Boggs should have perceived a significant risk to Cory is not enough to establish liability. (*Id.* at #2409 (citing *Farmer*, 511 U.S. at 837–38)). Instead, it's whether Boggs did in fact know. But, as previously mentioned, actual

knowledge can be inferred from circumstantial evidence. *Farmer*, 511 U.S. at 842. The Court concludes there's enough circumstantial evidence to leave the determination of whether Boggs *did know*, or merely *should have known*, for the jury.

### ii. Marcum and McNeil.

As stated above, Jessie argues there are three reasons that indicate Officers Boggs, Marcum, and McNeil were aware of Cory's medical emergency and ignored it. But only the first and third reasons apply for Marcum and McNeil: Cory was screaming and they must have heard, and they knew about Cory's past overdoses.

These reasons, however, are no reasons at all to infer Marcum and McNeil had knowledge of the antecedents to Cory's death. First, there is no record evidence to support the contention that Cory was screaming. *See supra* Law and Analysis, Part A.1. Even if there were, there is no record evidence to place Marcum or McNeil in the booking area in the hours before 10:00 p.m. Admittedly, the video shows them both in the area at that time, and Marcum admits he was "writing a report or completing shift logs" on the booking desk computer. (Booking Video, 22:00:01–01:00; Doc. 64-5, #296). But the record also established that Marcum had no interactions with Cory on June 18, 2022, prior to 10:01 p.m. (Doc. 64-5, #295). The same goes for McNeil. (Doc. 64-6, #298).

Jessie's other reason fares no better. Officer Marcum was aware that Cory had overdosed several times in April 2022. (Doc. 74, #1926). (The record is less clear on whether Officer McNeil also was aware.) But "merely showing [Cory] at one point had [a] tendenc[y to overdose] does not equate to establishing that [Cory] had serious

38

medical needs constitutionally requiring Defendants' attention at the time of the events at issue." *Campbell v. Riahi*, No. 1:20-cv-678, 2023 WL 5979211, at *4 (S.D. Ohio Sept. 13, 2023), *aff'd*, 109 F.4th 854 (6th Cir. 2024). Cory was not on suicide watch. (*See* Doc. 64-7, #311, 717, 731–35). Even if he was, Jessie has not argued that either Marcum or McNeil would have been the officers responsible for checking on Cory every ten minutes (as required under the suicide-watch policy) on June 18, 2022. (*Id.* at #308; Doc. 76, #2113). That would have been the responsibility of the officers assigned to the booking area.

So neither of Jessie's arguments as to Marcum or McNeil carry any weight. Accordingly, her claim that they knew of, and disregarded, Cory's medical need in the hours before his death fails.

### 2. Jessie's Narcan Theory Fails.

Now that the Court has covered the events occurring before 10:01 p.m., it turns to those that allegedly occurred after. Jessie argues that Defendants' failure to administer Narcan while treating Cory amounted to deliberate indifference. (Doc. 79, #2340–44).

Deliberate indifference to a prisoner's serious medical needs and "negligence in diagnosing or treating a medical condition" are two very different situations. *Farmer*, 511 U.S. at 835 (cleaned up) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The Supreme Court has clearly stated "that only the former violates the [Cruel and Unusual Punishments] Clause." *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they

responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Jessie's Narcan theory of liability is directly contrary to those points of settled law. In advancing this theory, Jessie focuses on the fact that Narcan was on hand and that Defendants had experience administering Narcan. (Doc. 79, #2341–42). True, during his previous time as a paramedic, Officer Boggs had administered Narcan many times. (Doc. 72, #1730). He has also administered Narcan between five and ten times at the Jail. (*Id.* at #1775). The others had administered Narcan in the Jail before or at least had seen other officers do so. (Doc. 79, #2341–42). So, based on their experience utilizing the medication (or observing it being utilized), Jessie says all five officers clearly should have used it here. (*Id.*).

But what Jessie's argument fails to acknowledge is that none of the officers thought it was appropriate or useful to administer Narcan in their judgment; that, or they were too occupied trying other methods to save Cory. (Doc. 64-2, #274; Doc. 64-3, #277–78; Doc. 64-4, #294; Doc. 64-5, #296). Jessie disputes whether Cory had a pulse and whether he was in cardiac arrest, as Defendants claim. (Doc. 79, #2343–44). But these disagreements are almost beside the point. What matters is that Defendants thought that Cory was suffering from those conditions, and they treated those conditions accordingly. Even if they were wrong, that smacks at most of negligence. But mere negligence does not support an Eighth Amendment deliberate indifference claim. *Alzid*, 2024 WL 4579427, at *5.

40

Moreover, as much as Jessie may argue otherwise, the video of the booking area clearly shows multiple officers trying to save Cory's life. After officers started providing care, at no point was CPR, or use of the AED, discontinued. (Doc. 64-5, #296). The officers continued frantically administering care until the paramedics arrived. On that note, further undercutting Jessie's position that the officers erred in failing to provide Narcan, even the paramedics did not administer Narcan after arriving. (Doc. 62, #255–57; Doc. 81-3). In short, Jessie tries to hold the officers accountable against a standard even higher than what courts consider when evaluating medical professionals. *See Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) (explaining that "ordinary individual outside a prison's walls and inmates within those walls both face a risk their doctors will perform incompetently" but that "mere malpractice does not violate the Eighth Amendment"); *Rhinehart v. Scutt*, 509 F. App'x 510, 513 (6th Cir. 2013) ("Neither negligence alone, nor a disagreement over the wisdom or correctness of a medical judgment is sufficient for the purpose of a deliberate[-]indifference claim."). That won't work, so the Court finds that her theory of liability based on the officers' failure to administer Narcan lacks merit.

\* \* \*

In short, viewing the facts in the light most favorable to Jessie, there is a genuine dispute of material fact as to whether Officer Boggs knew of Cory's distress and ignored the risk of harm to him. So the Court allows that claim to move forward to the finder of fact. But, for the other officer Defendants (Marcum, McNeil, Davila, and Aldrige), the record is insufficient to support a deliberate indifference claim—no reasonable jury could find that they were deliberately indifferent to Cory's medical

41

needs because they were unaware of his distress and their failure to administer Narcan was, if anything, mere negligence.

## C.   Officer Boggs Is Not Shielded by Qualified Immunity.

Even if a constitutional violation occurred, Defendants argue that qualified immunity shields them from liability. (*See* Doc. 65, #1119–24). This analysis is only necessary for Officer Boggs, as Jessie's constitutional claims against the other individual officer Defendants do not survive.

"A plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified immunity defense." *Alzid*, 2024 WL 4579427, at *4 (quoting *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608 (6th Cir. 2015)). Along those lines, "a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Burwell*, 7 F.4th at 476 (quotation omitted). The Court already found the former, so it need deal only with the latter. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (cleaned up).

"As early as 1972, [the Sixth Circuit has] stated that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'" *Burwell*, 7 F.4th at 477 (quoting *Est. of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir.

2005)). Thus, this right is clearly established. As discussed at length above, the Court believes there is a triable issue of fact on whether the circumstances in the hours before Cory's death were sufficient to show that Officer Boggs knew Cory required medical care. As a result, he is not entitled to qualified immunity.

### D. Jessie's Supervisory-Liability Claims Lack Merit.

Jessie's Amended Complaint also sought to hold Sheriff Thoroughman and Captain Roberts liable as supervisors. (*See* Doc. 48, #139, 141). She has since abandoned any claims against Defendant Roberts and concedes that summary judgment is appropriate. (Doc. 79, #2348 n.13). So the Court deals only with the potential supervisory claims against Defendant Thoroughman.[39]

"Courts have repeatedly explained that a supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Est. of Richardson by Richardson v. CoreCivic*, No. 1:24-cv-1128, 2025 WL 1559158, at *14 (W.D. Tenn. June 2, 2025). In other words, Jessie must show that Sheriff Thoroughman "implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of [an] offending subordinate" to hold him liable under a § 1983 supervisory-liability theory. *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (quotation and emphasis omitted). She cannot do so.

---

[39] While Jessie cannot prevail under a supervisory theory of liability "without establishing an underlying constitutional violation by a supervised employee," *Griffith*, 975 F.3d at 579, the Court has found that there is a genuine dispute of material fact concerning whether Boggs (a supervised employee) had the knowledge requisite to establish a constitutional violation. So the Court must evaluate potential claims concerning supervisory liability.

While it's tough to surmise exactly what Jessie is arguing with this standard in mind, she appears to stake her claim on Sheriff Thoroughman's failure to order a formal internal investigation and the fact that the Jail's video footage from June 18, 2022, before 10:00 p.m. was not retained on his watch. (*See* Doc. 79, #2336–37, 2345–46). But an after-the-fact determination not to investigate does not encourage a before-the-fact act of misconduct. Neither does the failure to retain potentially relevant video footage. Accordingly, Jessie's supervisory § 1983 claim against Defendant Thoroughman lacks merit.

### E.    Jessie's Municipal Liability Theory Also Does Not Past Muster.

Municipalities, such as the Scioto County Board of Commissioners, "may not be held liable under § 1983 on a respondeat superior theory—in other words, '*solely* because it employs a tortfeasor.'" *Griffith*, 975 F.3d at 580 (first emphasis omitted) (quoting *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014)). Instead, a plaintiff "must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). To do so, a plaintiff can prove: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision[-]making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.*

Here, Jessie pursues the second avenue. (*See* Doc. 79, #2344–46). She argues that Sheriff Thoroughman's failure to launch an internal investigation into Cory's death constitutes a failure to investigate that amounts to ratification. (Doc. 79,

#2344). To Jessie, there was only "an inadequate, sham investigation []conducted with the intent to shield employees from accountability rather than identify and punish perpetrators." (*Id.*).

To start, Jessie's position rests on several misconceptions. First, she argues that the investigation did not involve interviews of the officers involved in the last moments of Cory's life. (*Id.* at #2345). The record does not support that view. *See supra* note 26. True, Detective Conkel did not formally interview the officers, but she did question them at the scene. *Id.* Second, "sham" is a strong word for an investigation that led to the arrest and conviction of the man that sold Cory the drugs that ended his life. Perry Steele was arrested the day after Cory's overdose; he was later convicted of drug trafficking, but acquitted on an involuntary manslaughter charge. (Doc. 64-7; #312; Doc. 67, #1192).[40]

Moreover, even if Jessie's assertions were correct on those fronts, and even if the investigation was a "sham," her ratification argument would still fail. A "single instance of a failure to investigate, as alleged here, is insufficient to 'infer a policy of indifference.'" *Meirs*, 821 F. App'x at 453 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005)). Put differently, "there must be multiple earlier inadequate investigations and they must concern comparable claims." *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019); *see also David v. City of Bellevue*,

---

[40] Jessie also says that the Jail's deletion of the video footage of the time preceding Cory's death also contributes to a finding that the investigation was a "sham." (Doc. 79, #2345). But for the reasons explained in Law and Analysis, Part A.2, the Court does not agree with this negative inference.

45

706 F. App'x 847, 853 (6th Cir. 2017); *Pineda v. Hamilton County*, 977 F.3d 483, 495 (6th Cir. 2020) (describing how this requirement "follows from § 1983's causation element"). So, Jessie was required to illustrate a pattern of misconduct. And one instance is not a pattern.

Jessie's reliance on *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985), is misplaced.[41] Since *Marchese* was decided, the Sixth Circuit has "clarified the scope of th[e] 'ratification' theory in a way that dooms [Jessie's] claim in this case." *Pineda*, 977 F.3d at 495. And that clarification is that "an allegation of a *single* failure to investigate a single plaintiff's claim does not suffice." *Id.* Simply put, Jessie relies on outdated caselaw; her municipal liability claim cannot proceed.

## F. Jessie's State-Law Claims Also Fail.

Jessie separately seeks to hold Defendants accountable under state law. She asserts two claims. One as to all Defendants under Ohio's wrongful death statute. (*See* Doc. 48, #141–42 (citing Ohio Rev. Code § 2125.01, et seq.)). The other against Sheriff Thoroughman for violations of Ohio Revised Code § 311.05, which states that a "sheriff shall only be responsible for the neglect of duty or misconduct in office of any of his deputies if he orders, has prior knowledge of, participates in, acts in reckless disregard of, or ratifies the neglect of duty or misconduct in office of the

---

[41] As is her reliance on *Otero v. Wood*, 316 F. Supp. 2d 612 (S.D. Ohio 2004) and *Wright v. City of Canton*, 138 F. Supp. 2d 955 (N.D. Ohio 2001). Both of those cases relied on *Marchese* and *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241 (6th Cir. 1989). *See Otero*, 316 F. Supp. 2d at 627–28; *Wright*, 138 F. Supp. at 966.

deputy." Defendants, for their part, argue they are entitled to statutory immunity under state law.[42]

"Ohio Revised Code Chapter 2744 grants immunity to political subdivisions and to employees of political subdivisions for actions arising within the course or scope of their employment." *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020). So, as for the Scioto County Board of Commissions, it is immune unless one of five exceptions applies here. Ohio Rev. Code § 2744.02(B)(1)–(5). Jessie fails to identify an applicable exception and concedes that "[s]tate statutory immunity [] likely shield[s] Scioto County itself from state-law liability." (Doc. 79, #2347 n.11). So Jessie's state-law claim against the Scioto County Board of Commissions fails.

As for the individual Defendants, "Ohio law grants immunity from civil suits to employees of political subdivisions unless" one of three exceptions applies. *Wright*, 962 F.3d at 878 (citing Ohio Rev. Code § 2744.03(A)(6)(a)–(c)). The exception that potentially applies here is when an "employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). As this Court has noted before, "[t]hat sounds a lot like deliberate indifference." *Campbell v. Riahi*, No. 1:20-cv-678, 2023 WL 5979211, at *8 (S.D. Ohio Sept. 13, 2023), *aff'd*, 109 F.4th 854 (6th Cir. 2024)). In fact, "[w]hen federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same

---

[42] The Court appreciates when parties decide to read and reference its past decisions. But the Court notes that while imitation can be a form of flattery, it prefers citation and appropriate punctuation when a party relies on its past recitations of law. (*Compare* Doc. 65, #1127, *with Campbell v. Riahi*, No. 1:20-cv-678, 2023 WL 5979211, at *8 (S.D. Ohio Sept. 13, 2023), *aff'd*, 109 F.4th 854 (6th Cir. 2024)).

questions of material fact, we may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'" *Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)). So "when the employee is found to have not acted with deliberate indifference under federal law, he is entitled to immunity under § 2744.03(A)(6)(b)." *Campbell*, 2023 WL 5979211, at *8.

Accordingly, consistent with the above, state statutory immunity shields the individual Defendants except for Officer Boggs (since no other individual Defendant could possibly be found to be deliberately indifferent to Cory's medical needs).

## G.    The Official-Capacity Claims Are Redundant.

Some final cleanup remains. Jessie sued every Defendant in their official capacity in addition to naming the Scioto County Board of Commissioners. (*See* Doc. 48, #124–27). Suits against individuals in their official capacity are essentially suits directly against the local government—here the Scioto County Board of Commissions. *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245–46 (6th Cir. 1989). "Where the entity is named as a defendant, an official-capacity claim is redundant." *Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014); *see also Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 509 (6th Cir. 1996).

Recognizing this, Defendants ask the Court to dismiss Defendants Scottie Powell, Bryan Davis, and Cathy Coleman—members of the Scioto County Board—because Jessie sues them only in their official capacities. (Doc. 65, #1110–11). In the same vein, they also ask that the Court dismiss all other official-capacity claims

against all other individual Defendants as well. (*Id.*). Jessie does not oppose these requests. (Doc. 79, #2348 n.13). Further, the Court agrees these claims are redundant. As the Court has already determined no municipal liability lies, this is essentially moot. But to be clear, the Court also dismisses the official-capacity claims against the individual Defendants.

## CONCLUSION

For the reasons above, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 65). First, the record does not support a finding of municipal liability. So the Court **DISMISSES** Plaintiff's claims against the Scioto County Board of Commissions and all Defendants sued in their official capacities. Second, the Court **DISMISSES** the individual-capacity claims against Defendants Davila, Marcum, Aldridge, and McNeil because the evidence does not support Plaintiff's deliberate indifference claims against them. Third, the Court **DISMISSES** the individual-capacity claims against Defendants Thoroughman and Roberts since Plaintiff's supervisory-liability theory lacks merit. Finally, however, because a jury could conclude that Defendant Boggs was aware of Cory Cantrell's medical need and ignored it in the hours before officers started treating him, Plaintiff's deliberate indifference claim against Defendant Boggs may proceed to trial. Accordingly, the Court **DIRECTS** the Clerk to **TERMINATE** the following Defendants on its docket: Scioto County Board of Commissioners; Scottie Powell; Byran Davis; Cathy Coleman; David Thoroughman; Damon Roberts; Rebecca Davila; Casie Marcum; Kenneth Aldrige; and Devyn McNeil.

**SO ORDERED.**

September 30, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**